*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 16-FS-164 & 16-FS-172

IN RE PETITION OF J.O. & P.O.,

N.B. & KI.B., APPELLANTS.

**01/11/2018**

FILED
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeals from the Superior Court of the
District of Columbia
(ADA-116-14)

(Hon. Noel T. Johnson, Magistrate Judge)
(Hon. Craig Iscoe, Reviewing Judge)

(Argued October 18, 2016                    Decided January 11, 2018)

*Carla S. Rappaport* for appellant N.B.

*Leslie J. Susskind* for appellant Ki.B.

*Patricia M. Spicer* for appellees J.O. and P.O.

*Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General at the time the brief was filed, *Loren L. AliKhan*, Deputy Solicitor General, and *Rhondalyn Primes Okoroma*, Assistant Attorney General, filed a statement in lieu of brief in support of appellees.

*Charles Feezor*, guardian ad litem, filed a statement in lieu of brief.

Before FISHER and THOMPSON, *Associate Judges*, and RUIZ, *Senior Judge*.

RUIZ, *Senior Judge*: This appeal concerns the petition of appellees J.O. and

P.O. to adopt K.B., which was granted on June 15, 2015. Appellants N.B. and

Ki.B. (Mr. B. and Ms. B.), who are the child's natural parents, separately appeal the adoption. Mr. B. challenges the waiver of his consent to the adoption, and Ms. B. the denial of her motion to revoke her consent to the adoption. We conclude that the trial court's determination that Mr. B. is an unfit parent and that he withheld his consent contrary to the best interests of the child was not an abuse of discretion. We also conclude that the finding that Ms. B.'s consent was voluntary is supported by the record. Therefore, we affirm the grant of the O.'s adoption petition.

## I.

K.B. was born on October 23, 2011. When he was ten months old, K.B. was removed from appellants' care by the Child and Family Services Agency following Ms. B.'s arrest for possession of marijuana. He was placed with appellees as foster parents the same day. The government alleged that K.B. was a neglected child within the meaning of D.C. Code § 16-2301 (9)(A)(iii), and appellants stipulated to his neglect in November 2012.[1]

---

[1] The stipulation of neglect was based on the fact that both parents were incarcerated at the time, for possession of marijuana, and were, therefore, unavailable to care for K.B.

Initially, K.B.'s permanency goal was reunification with his parents, and the court ordered parenting classes and drug-testing services for appellants. However, citing concerns about appellants' continued substance abuse and failure to consistently visit K.B., the court changed the goal to adoption by the appellees on January 7, 2014. On June 24, 2015, the appellees filed a petition for adoption.

**A.  Trial Court Proceedings as to Mr. B.**

The trial court heard a great deal of testimony about Mr. B.'s history of mental illness and substance abuse. Dr. Seth King, a psychologist who completed evaluations of both appellants in November 2012 (two years prior to trial), testified about his evaluation of Mr. B. Dr. King diagnosed Mr. B. with schizophrenia, major depressive disorder, post-traumatic stress disorder, and marijuana and nicotine dependence. He based these diagnoses on Mr. B.'s reports, mental health records, and symptoms observed during the evaluation. Dr. King testified that Mr. B. rated a 40 (on a zero to 100 scale) on the Global Assessment of Functioning, which "indicat[ed] that he was having some symptoms of mental health problems, difficulties, which affected his stability and his functioning." Dr. King expressed concern that Mr. B.'s mental health symptoms and use of marijuana "would interfere with a person's ability to focus effectively, consistently, to be able to care

for a child's needs." He also opined that ongoing treatment "would be a step in the right direction," but that he would still have concerns about Mr. B.'s long-term parenting ability even with treatment. Dr. King noted that he was troubled by Mr. B.'s reliance on Ms. B. as part of his support system in parenting K.B., since he felt that, in light of Ms. B.'s own issues with mental illness and substance abuse, this meant there would be times when there was no stable adult in the household.

Amanda Giordano, Mr. B.'s case manager at Community Connections since July 2014, testified about Mr. B.'s ongoing mental health treatment. Ms. Giordano testified that Mr. B., who had been diagnosed through Community Connections with schizoaffective disorder and poly substance dependence, received the most intensive level of services available. He was a "model consumer" of treatment who regularly attended his appointments and was medication-compliant. She described his symptoms as "a tendency to be tangential, a little disorganized in his thought process and speech," but said that those symptoms had decreased during the time she had been working with Mr. B. However, she also testified that she had become concerned about Mr. B.'s possible substance use after noticing that he seemed disoriented during meetings.

Mr. B. testified that he had been in treatment for schizophrenia for twenty years. He acknowledged that he had used marijuana in accordance with his Rastafarian religion, but testified that he stopped using it when the court ordered him to in connection with the neglect proceeding in 2012 and had been clean for two years. Mr. B. testified that he had instead been smoking K2, a form of synthetic marijuana. The records of Mr. B.'s court-ordered drug testing (between August 28, 2012, and November 18, 2014) indicated that he had tested positive twice, had tested negative nineteen times, and had missed sixteen tests; the lab did not test for synthetic marijuana.[2]

The court also heard testimony about Mr. B.'s relationship with K.B. India Ford, the ongoing social worker in K.B.'s neglect case, testified that since K.B. was placed in foster care in August 2012, Mr. B. initially engaged in court-ordered weekly visitation, but failed to appear for his visits between September and December 2013, and again between March and July 2014.[3] She also testified that, when she asked Mr. B. in November 2013 why he was not visiting, he said that he "thought that [the Child and Family Services Agency] had taken [K.B.] away, like

---

[2] Mr. B. tested positive for marijuana on November 20, 2012, and for amphetamines on December 19, 2013.

[3] Ms. Ford testified that Ms. B. told her that the gap in visitation in 2014 was due to appellants' incarceration.

it was just a done deal at that point." He said he was "sad" about K.B. Ms. Ford reassured him that he could "absolutely have visitation." Mr. B. visited K.B. after December 2013 until his incarceration in March 2014.[4] He did visit consistently once he resumed visitation again after July 2014, and did not miss any visits. During his visits, Mr. B. was energetic and engaged with K.B., and K.B. was typically happy to spend time with his father. K.B. called Ms. B. "mommy, or mama," and Mr. B. "daddy, or dad." However, Ms. Ford testified that in the two months before her trial testimony, K.B. had cried until he was put back in the car to leave the visit.

The magistrate judge found that Mr. B. was not a fit parent. The judge cited Mr. B.'s mental health diagnoses and Dr. King's concerns about Mr. B.'s reliance on Ms. B., who also has mental health and drug issues, and found that "absent a support system involving a constant, appropriate adult presence, the father's mental health issues render him presently unable to safely care for [K.B.]." He also cited Mr. B.'s "refusal to abstain from mind-altering substances" and found

---

[4] Ms. B. was in jail at the time of Ms. Ford's conversation with Mr. B. in November 2013. Ms. Ford testified that Mr. B. did not resume visitation immediately after this conversation, but rather once Ms. B. was released from jail after December 2013.

that Mr. B. had not "sufficiently addressed his substance abuse issues." The magistrate judge concluded as follows:

> The father's mental health and substance abuse issues, combined with his lapses in visitation and his inability to articulate a plan for resuming care of the respondent make plain that he is not presently capable of caring for the child. Furthermore, the evidence established that there is very little chance that he will become ready to do so in the foreseeable future. The father has been engaged with services designed to address his issues for an extended period of time now, and has not made sufficient progress. As such, the Court finds by clear and convincing evidence that the father is not a fit parent.

The magistrate judge also found that, weighing the statutory factors to be considered for termination of parental rights, Mr. B. had withheld his consent to the adoption contrary to K.B.'s best interests.[5] As such, he ruled that Mr. B.'s consent should be waived pursuant to D.C. Code § 16-304 (e), and that adoption by the appellees is in K.B.'s best interests. The associate judge affirmed the trial court's finding of parental unfitness and determination to waive the father's consent, and Mr. B. filed this appeal.

---

[5] These factors are considered *infra*.

**B.  Trial Court Proceedings as to Ms. B.**

Similar testimony was presented about Ms. B.'s ability to care for K.B.  Dr. King, who evaluated Ms. B. in 2012, and Dr. David Ault (Ms. B.'s treating psychologist at Green Door) both testified that Ms. B. had been diagnosed with major depressive disorder; post-traumatic stress disorder; and alcohol, cannabis, and tobacco use disorders.  Dr. Ault also testified about Ms. B.'s alcohol consumption, including the fact that her alcoholism was not considered to be in remission because she had not been alcohol-free for the past twelve months.  He also reported that Ms. B. had had alcohol-induced seizures, which were being treated with medication, and that she had suffered from occasional memory lapses, auditory hallucinations, and unexplained anger attacks.  Ms. Ford, the social worker in the neglect case, testified about Ms. B.'s relationship with K.B., and about her decision to recommend supervised visits after Ms. B. relapsed by drinking, during an overnight unsupervised visit K.B. had with his parents in August 2013, and passed out and assaulted Mr. B.'s sister.

The foregoing testimony took place during the first three days of trial in November 2014.  When trial resumed on January 12, 2015, the proceeding opened with P.O.'s testimony.  P.O. testified about her family's relationship with K.B. and

about his health and developmental delays. She testified that K.B. had exhibited some delays in his physical development, including not walking until he was eighteen months old, but that he was now "doing fine in that area." She also stated that K.B. had some "language delays, and maybe some cognitive delays." For example, at three years old, K.B. should have been able to speak in complete sentences, but he only used one word sentences, "more like . . . where a child would be functioning if they were a year and a half." P.O. previously worked as a school psychologist and was a special education teacher for fifteen years. She testified that she was "working with [K.B.] at home every day" to address his delays, and that she was considering the possibility of speech and language therapy in the future. P.O. also testified that, if the adoption petition were granted, she would want K.B. to maintain some contact with appellants, because she wanted him "to know who [his] biological parents are" and "to have a good healthy relationship with them." Appellees have another adopted child, who has maintained contact with his birth mother since his adoption. After P.O.'s testimony was concluded, Ms. B.'s attorney, Kathryn Graham, informed the court before the luncheon recess that she hoped to speak with Ms. B. as soon as she was able to return to the courtroom.

When the trial resumed after lunch, Ms. B. asked the court if she could have a different lawyer, and said that she already knew who she wanted to represent her. The court denied her request, stating that it would be disruptive "in the middle . . . of a multi-day trial" to bring in a new lawyer. Ms. B. then asked if Ms. Graham could "receive assistance from another attorney," which the court also denied as "[un]necessary." Ms. B. gave no further grounds for her request, nor did the trial judge inquire as to the reason. After Ms. Graham consulted with the trial judge about the proper procedure, the court asked her to file a motion to withdraw so that it could be noted on the record.

Ms. Graham and appellees' attorney then asked for a ten-minute recess so that Ms. B. and P.O. could speak with each other off the record. After this recess, Ms. Graham indicated that the conversation was "really beneficial" and that Ms. B. "is not prepared to consent [to the adoption] right now, but, is contemplating it."

Ms. B. took the stand the next day, January 13, 2015. She testified about her history of substance abuse and the steps she had taken towards sobriety, as well as about her mental health. Ms. B. testified that she was "a hundred percent committed" to her sobriety and mental health treatment. She also stated that having K.B. back was "the most important thing in the world" to her. Ms. B.

admitted that she had recently been incarcerated, and that she was currently on probation and had at least one criminal charge pending against her at the time. She also testified about her struggles with relapses, but stated that she had been alcohol-free for the past eleven months. On cross-examination, Ms. B. was questioned about her pending criminal charges, and about her alcohol use and the relapse she had during one of K.B.'s unsupervised overnight visits.

The court adjourned for the day before Ms. B.'s testimony was finished, so she took the stand again on the morning of January 14, 2015. K.B.'s guardian *ad litem* briefly cross-examined Ms. B. regarding her alcohol use while she was pregnant with K.B. Ms. B. testified that this was a planned pregnancy and that she had stopped drinking and smoking marijuana as soon as she became aware that she was pregnant, which occurred "within a month."[6] On redirect examination, Ms. B. stated that she would ensure K.B.'s safety with "a stable family support system" if she were to relapse again. She testified about the positive changes she had made in her life in order to be better able to parent K.B., including abstaining from

_____

[6] The GAL's questioning suggested that K.B. had been born premature and underweight (5.4 pounds), and that Ms. B. had been told it was because of her alcohol use. Ms. B. denied that she had ever been told that, and stated that if it had been so, she would not have been allowed to take the baby home. Dr. Aimee Grace, K.B.'s pediatrician, testified that in K.B.'s newborn visit, there was documentation that K.B.'s mother had been drinking alcohol until one month into her pregnancy, when she found out that she was pregnant.

substance use, taking her medication, and having a stable relationship with Mr. B., which she described as "a loving committed relationship where we put our children's needs first, and foremost before our own." Ms. B. concluded her testimony as follows:

> [I am a] hundred percent committed to my sobriety. I want my sobriety because I want to get better. I want a better life for myself, for my kids, for my future. I plan to go back to school. I have a lot of aspirations that will keep me focused on wanting, and having a better life for myself, and for my kids.

As soon as Ms. B.'s testimony was concluded, and before closing arguments began, Ms. Graham asked the court for a brief recess to consult with her client. After conferring with Ms. B. for just over one minute, Ms. Graham informed the court that "at this time my client has indicated that she wishes to consent to the adoption." She further indicated that Ms. B. had "reviewed the consent, and we have talked about it at length, this week, and this morning before court." The court was surprised, given the testimony that Ms. B. had just completed, and Ms. Graham stated, "I'm telling her this is her opportunity." Ms. B. then spoke up, telling the court that she "want[ed] the best for [her] son," and stating, "If this, I believe will bring the best to my child's life, then, please, would you consider to me consenting to the adoption."

After Ms. B. signed the consent form with her attorney, the court engaged in extensive *voir dire* of Ms. B. to ensure that her consent to the adoption was knowing and voluntary. Throughout the court's questioning, Ms. B. was plainly emotional. As the court asked whether Ms. B. understood that she was giving up her legal parental rights, Ms. B. answered affirmatively, but became so upset that the court stopped several times to allow her to compose herself and "make sure [she understood] the seriousness of the action that [she was] taking."

The court noted that Ms. B. had asked for and been denied new representation two days before. The magistrate judge asked "whether or not [she had] had sufficient advice of counsel," and Ms. B. (who was crying) asked, "Is there anything I can do? . . . My sweet baby." The court asked, "Are you sure you want to consent?" and Ms. B. replied, "Yes." The court again expressed concern that she was making an important decision about which she was clearly upset, and repeated, "Are you taking this action freely and voluntarily?" Ms. B. replied, "Yes." The court also repeated, "Have you had the advice of counsel?" and Ms. B. again replied, "Yes."

The court then asked Ms. B. if she felt like she was being pressured to consent. Ms. B. apparently shook her head but gave no verbal response, and then stated, "I had one relapse during the whole time, that's with the baby. It's serious." The court responded that it was serious, and Ms. B. asked, "With one relapse, though, Your Honor? . . . Only one relapse, though, is that serious? . . . Do you know how many people — that don't even want their kids still got them[?]" The court asked once again whether she wished to consent, and Ms. B. again replied, "Yes." The court found that Ms. B. was giving consent knowingly and voluntarily, and with advice of counsel, and it accepted her consent. That same day, Ms. B. and appellees signed a Post-Adoption Contact Agreement, in which they agreed that Ms. B. would be "welcome to schedule a supervised visit with [K.B.] . . . at a minimum two times per year" and that K.B. "should have reasonable telephone access to [Ms. B.]."

Ms. Graham moved to withdraw as Ms. B.'s counsel on March 18, 2015. Ms. B., represented by new counsel, filed a motion for leave to revoke her consent on April 30, and the court held a hearing on June 5, 2015. At the hearing, Ms. B. claimed that her consent was not voluntary because she had been incarcerated at the time, and because Ms. Graham had pressured her into believing that she would have no chance of seeing K.B. unless she consented and signed the Post-Adoption

Contact Agreement.[7] She testified that Ms. Graham had told her that "if you don't sign, your baby, that you'll never get to see your son again," and had told her, "You should just sign this because you'll never get to see your son again if you don't." Ms. B. also testified that, at the time of her consent in court, she "wasn't feeling too well" and could not remember what the magistrate judge had asked her, because her "head wasn't together at all that day."

The court found that Ms. B.'s testimony at the hearing on the motion to revoke her consent was "inconsistent and self-serving." The court noted that, when Ms. B. signed the consent in open court five months earlier, "she repeatedly affirmed her desire to consent and . . . [took] that action freely and voluntarily." The court also found that Ms. B. gave her consent, not as a result of her incarceration, but "strategically after sitting through the entirety of a four day trial, in an effort to preserve the possibility of future contact with her son." The magistrate judge thus denied her motion for leave to revoke her consent. On appeal to Superior Court, the associate judge affirmed the magistrate judge's finding that Ms. B. voluntarily consented to the adoption. Ms. B. then filed this appeal, which was consolidated with Mr. B.'s appeal.

---

[7] Ms. B. was in custody at the time of the trial, and was escorted to and from the courtroom by marshals.

**II.**

This court reviews the trial court's decisions on appeal for abuse of discretion, errors of law, and clear lack of evidentiary support. *In re J.J.*, 111 A.3d 1038, 1043 (D.C. 2015). In reviewing for abuse of discretion, this court considers "whether the trial court 'exercised its discretion within the range of permissible alternatives, based on all the relevant factors and no improper factor.'" *In re T.J.*, 666 A.2d 1, 10 (D.C. 1995) (quoting *In re Baby Boy C.*, 630 A.2d 670, 673 (D.C. 1993)). Legal questions are reviewed *de novo*, but findings of fact are reviewed for clear error. *See* D.C. Code § 17-305 (a). Thus, the decision under review must provide "substantial reasoning" that is based on correct legal principles and has a "firm factual foundation in the record." *In re C.L.O.*, 41 A.3d 502, 510 (D.C. 2012) (quoting *In re C.A.B.*, 4 A.3d 890, 900 (D.C. 2010)).

While procedurally this appeal is from the associate judge's order, on appellate review of the trial court's final order we "look to the findings and conclusions of the fact finder [the magistrate judge] on which that ruling is based." *Id*. Thus, this court considers both the associate and magistrate judges' rulings.

## A. Mr. B.'s Parental Fitness

In general, an adoption requires the consent of the natural parent. D.C. Code § 16-304 (a). Parental consent can be waived, however, but only if the court finds, first, that the natural parent is "unfit," *see In re Ta.L.*, 149 A.3d 1060, 1081 (D.C. 2016) (en banc), and, second, that the parent is withholding consent contrary to the best interests of the child. D.C. Code § 16-304 (e). Placing the child with a natural parent is presumed to be in the child's best interest, "provided the parent has not been proven unfit." *In re S.L.G.*, 110 A.3d 1275, 1285 (D.C. 2015) (quoting *In re S.M.*, 985 A.2d 413, 417 (D.C. 2009)).[8] This presumption "reflects and reinforces the fundamental and constitutionally protected liberty interest that natural parents have in the care, custody, and management of their children." *Id.* at 1286; *see also*

---

[8] A fit parent is presumed to act in the best interests of the child. Therefore, where a child has a fit parent, "there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel v. Granville*, 530 U.S. 57, 68-69 (2000) (quoted in *In re S.L.G.*, 110 A.3d at 1286 n.23). We have recognized that there might be "truly exceptional circumstance[s]" where "a continuation of the parental relationship [between a fit parent and child is nonetheless] detrimental to the best interest of the child." *In re Ta.L.*, 149 A.3d at 1083 (quoting *In re S.L.G.*, 110 A.3d at 1289). Such an exceptional circumstance requires that the trial court be "satisfied by clear and convincing evidence that reunification of the child with the family would grievously harm the child . . ." *Id.*

*Santosky v. Kramer,* 455 U.S. 745, 753 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."). In order to determine whether the presumption that placement with the natural parent is in the child's best interest has been overcome, a court must first decide, by clear and convincing evidence, that the parent has been proven unfit. *See In re Ta.L.*, 149 A.3d at 1081.

The determination of whether a parent is unfit "is not merely a restatement of the 'best interests of the child'. . . ; '[f]itness,' rather, is an independent determination of parental 'intention and ability over time,' . . . to resolve the natural parent's capacity to 'care for the child' and protect the child against 'undue risk of harm.'" *Id.* at 1083 (quoting *In re G.A.P.,* 133 A.3d 994, 998 (D.C. 2016)). Specifically, the focus is on "whether the parent is, or within a reasonable time will be, able to take care of the child in a way that does not endanger the child's welfare." *Id.* at 1082 (quoting *In re S.L.G.*, 110 A.3d at 1286-87). Factors to be considered in determining whether a natural parent is unfit include:

> [A] failure to maintain contact with, nurture, or support the child; . . . the inability or unwillingness to make reasonable efforts to . . . provide a safe and stable home for the child, or to meet a particular child's special needs;

> chronic drug or alcohol abuse; and mental health issues or other impairments that demonstrably interfere with the parent's ability to care for the child or that expose the child to undue risk of harm.

*In re S.L.G.*,110 A.3d at 1287. The determination of unfitness is focused on the parent's willingness and ability and because it is a determination separate from the issue of consent to adoption (or waiver of that consent) should not be made by directly comparing the natural parent with the adoption petitioners and granting the adoption "simply because [the petitioners] are 'fitter.'" *Id.* at 1288 (quoting *Appeal of H.R.*, 581 A.2d 1141, 1178 (D.C. 1990) (Ferren, J., concurring)).

Mr. B. argues that the magistrate judge impermissibly relied on vague and outdated information about Mr. B.'s mental health in determining that he was unfit. We disagree. It is true that the court's order relied significantly on Dr. King's testimony, which was based on an evaluation of Mr. B. that took place two years before the trial. However, the diagnoses that the court cited from Dr. King's evaluation were corroborated by Mr. B.'s more recent diagnoses at Community Connections. The court pointed to Mr. B.'s diagnoses of "schizophrenia, undifferentiated type, post-traumatic stress disorder, and major depressive disorder." When Mr. B. began receiving services at Community Connections, he was diagnosed as suffering from schizoaffective disorder with poly substance

abuse.  Ms. Giordano, his case manager at Community Connections since July 2014, indicated that this was a current diagnosis.  Mr. B. himself testified that his mental health diagnosis was schizophrenia.

It is well established that the fact that a parent has a mental or other illness does not make the parent unfit.  *See, e.g.*, *In re J.G.*, 831 A.2d 992, 1001 (D.C. 2003) ("a parent's poverty, ill health, or lack of education or sophistication, will not alone constitute grounds for termination of parental rights"); *In re M.M.M.*, 485 A.2d 180, 184 (D.C. 1984) ("The emotional welfare of . . . the natural parent [] is relevant only 'to the degree that such affects the welfare of the child . . .'" (quoting D.C. Code § 16-2353 (b)(2))).  The question for the court remains the parent's ability to care for the child.  Thus, what is relevant is whether the illness "demonstrably interfere[s]" with the parent's child-caring abilities.  *In re S.L.G.*, 110 A.3d at 1287; *see In re K.J.L.*, 434 A.2d 1004, 1006-07 (D.C. 1981); *see also In re K.M.*, 75 A.3d 224, 231 (D.C. 2013) (in a neglect case, there must be "a nexus between a parent's [] mental incapacity and an inability to provide proper parental care" (internal citation and quotation marks omitted)).

The magistrate judge found that Mr. B. was "still in need of intensive ongoing therapy" and would be unable to "focus on and appreciate the needs of a

small child" on his own. In addition to Dr. King's testimony, the court heard Ms. Giordano's testimony that Mr. B. was currently receiving "the most intensive level of services in the community for mental health treatment." She also testified that managing his symptoms was "sometimes difficult for him," and that she was still working with him on his tendency to be "tangential, a little disorganized." In fact, she had noted in September 2014 that Mr. B. experienced "frequent confusion[,] making accomplishing tasks, such as keeping medication appointments, to be a problem."[9]

Mr. B.'s proposed support system if K.B. were placed with him was inadequate. When Dr. King evaluated him, Mr. B. had named Ms. B. as his "primary support system" in parenting K.B. Dr. King found this to be of concern, as Ms. B. also had significant mental health and substance abuse issues, and so there might be times when both parents were having difficulties and there would be "no stable adult in the household to address the concerns of the child." Ms. Ford also testified that, after she became aware of Ms. B.'s relapse in 2013 and a change

---

[9] This case is therefore distinguishable from *In re K.M.*, where the court concluded that Dr. King and Dr. Theut provided "largely conditional testimony," expressed in "broad and vague terms," that was too "generalized" to establish that, even if harm *could* befall a child from exposure to a mother's delusional behavior, it likely *would* do so. 75 A.3d at 234. In addition, Dr. King's testimony in this case was confirmed by Mr. B.'s case worker, Ms. Giordano.

was made to supervised visits, Mr. B. expressed that "he didn't think he could parent K.B. independent of Ms. B." and that he "felt that he absolutely needed [his family's] support." His actions confirm his statement as he did not resume visitation with K.B. until Ms. B. was released from prison. See note 4, *supra*. At trial, however, Mr. B. testified that he thought he could be capable of parenting K.B. by himself if Ms. B. was unable to help. He added that if he needed support parenting K.B., he would call upon "God . . . I got a brother. I got a sister . . . I'd probably talk to one of my aunt[s]." He indicated that his brother was unemployed and was attending Green Door for mental health treatment. No information was provided with respect to the other family members' capabilities or willingness to assist in caring for a young child. Thus, except for Mr. B.'s trial testimony, which was contradicted by his prior statements and actions, the evidence of record supported that Mr. B. did not believe that he was capable of safely caring for K.B. on his own, and he relied on others who, like him, would at times be unable to care for K.B. because of their own mental health and substance abuse issues. [10]

---

[10] The trial court also questioned whether Mr. B. had the intention to care for K.B. based on his voluntary decision to stop visiting the child "for extended periods of time" in the fall of 2013 and spring of 2014, during which Ms. B. was incarcerated.

Finally, Mr. B. has a long history of substance abuse, a factor to be considered in determining a parent's fitness. *In re S.L.G.*, 110 A.3d at 1287. Dr. King diagnosed him with cannabis dependence based on Mr. B.'s report that he had been using marijuana "as long as he could remember" and had progressed to using it daily. Mr. B. was diagnosed with poly substance dependence through Community Connections in 2014. Mr. B. testified that he stopped using marijuana when the court ordered him to in 2012, but other evidence refuted this: he missed sixteen drug tests and tested positive twice during the 2012-2014 court-ordered drug testing period. Indeed, his case manager testified that she worried that Mr. B. was using illegal substances after he appeared disoriented at their meetings. Mr. B. himself admitted that he had begun using K2, a synthetic form of marijuana, which would not have shown up on the court's drug tests. Dr. King testified that this use of K2 implied continuing substance abuse that could lead to resuming use of marijuana.

Based on the evidence at trial, Mr. B. clearly has a history of chronic drug abuse, as does Ms. B. (who lives in the same home and would be part of Mr. B.'s support system), and continues to use mind-altering substances.[11] While Mr. B has

---

[11] Both Mr. B. and Ms. B. testified that they were living together in a two-bedroom apartment.

commendably sought treatment for his mental illness and made some progress dealing with its symptoms, his condition leaves him confused and disorganized in a way that interferes with his ability to identify and respond to a child's needs, in addition to his own. Mr. B. expressed doubts that he would be able to parent K.B. by himself, and relied on Ms. B. to care for the child. For example, although Mr. B. was consistent in his weekly visits to K.B., he did not visit during the time Ms. B. was incarcerated. Ms. B.'s support could not be assured, however, in light of her personal challenges with mental illness and substance abuse and periods of incarceration. (She was incarcerated at the time of trial.) Moreover, by the time the court decided whether Mr. B. had the wherewithal to parent K.B., Ms. B. had consented to the adoption. The combination of these myriad conditions provides a firm factual foundation for the court's finding that Mr. B. is not "able to care for [K.B.] in a way that does not endanger the child's welfare," nor was it likely that he would be able to do so "within a reasonable time." *In re S.L.G.*, 110 A.3d at 1287. It was therefore not an abuse of discretion for the magistrate judge and the associate judge to find that Mr. B. is not fit to parent K.B.

## B.  Waiver of Mr. B.'s Consent

If a court finds, by clear and convincing evidence, that a natural parent is unfit, the strong presumption that placement with a natural parent is in the child's best interest falls away.  *See In re Ta.L.*, 149 A.3d at 1081.  A finding that a parent is not able to care for a child himself does not, however, terminate parental rights. *See In re Adoption of Jayden G.*, 70 A.3d 276, 301-02 (Md. 2013).  Thus, even without the presumption, the court may not grant adoption over a natural parent's objection unless it finds, by clear and convincing evidence, that the parent is withholding consent contrary to the best interests of the child.  *See In re S.L.G.*, 110 A.3d at 1285; *see also In re T.J.*, 666 A.2d at 15 (holding that where parent is unable to care for child due to mental illness, i.e., is unfit, but is competent, trial court must find, by clear and convincing evidence, that parent's choice of fit adopted parents would be "clearly contrary to child's best interest").  In deciding what is in the child's best interests, the court will look to the factors considered in a termination of parental rights ("TPR") proceeding, because an adoption over a natural parent's objection is the "functional equivalent" of a termination of parental rights.  *In re S.M.*, 985 A.2d at 416.  The relevant statutory factors are:

> (1)  the child's need for continuity of care and caretakers
> and for timely integration into a permanent home, taking

into account the differences in the development and the concept of time of children of different ages;

(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;

(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent; . . .

(4) to the extent feasible, the child's opinion of his or her own best interests in the matter; and

(5) evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided . . . .

D.C. Code § 16-2353 (b). If the court finds that the parent's withholding of consent is contrary to the child's best interests, then the parent's consent may be waived by the court.

The trial court followed this analytical framework. As discussed above, the trial court first found that Mr. B. was not able to care for K.B. and therefore was not entitled to the presumption that K.B.'s best interests would be served by placement with his natural father. The trial court then considered each of the relevant TPR factors, and found that they weighed in favor of placing K.B. with appellees. We perceive no abuse of discretion in the trial court's assessment that, viewed as a whole, the evidence relevant to the TPR factors established, by clear

and convincing evidence, that K.B.'s best interests were served by placement with appellees, and that Mr. B.'s consent to the adoption should be waived.

The first factor is the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home. D.C. Code § 16-2353 (b)(1). At the time of the magistrate judge's decision in October 2015, appellees had been K.B.'s caretakers for most of his life, since August 25, 2012, when he was ten months old. During that time, he had developed a close and loving relationship with appellees and with his foster-siblings. K.B. refers to P.O. as "mama" and J.O. as "dadda," and is close with the other two children in appellees' home. Appellees have met K.B.'s needs since he was placed with them, and have helped him with his developmental delays in communication and gross motor skills,[12] particularly as P.O. has a background in early childhood special education. Mr. B., on the other hand, has not been a consistent presence in K.B.'s life, and although he has demonstrated deep affection for his child, the evidence of his lack of fitness also indicates that he is not capable of providing a stable home and care for a young child with K.B.'s needs. We see no reason to disturb the trial court's determination that this factor weighs in favor of placement with appellees.

---

[12] K.B. is a small but healthy child who has developmental delays, such as struggling to speak in complete sentences, and some problems with motor skills.

The second factor is the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child. D.C. Code § 16-2353 (b)(2). Appellees are in good health in all respects, and as noted previously, have helped maintain K.B.'s health and development since he entered their care. Mr. B. has been diagnosed with serious mental illnesses, including schizophrenia or schizoaffective disorder, as well as substance dependence, and still struggles with symptoms of disorganization and disorientation as a result of these conditions. Mr. B.'s continuing need to address his own health issues makes it unlikely that he can adequately take care of K.B.'s physical, mental, and emotional needs. The trial court thus properly found that this factor also weighs in favor of placing K.B. with appellees.

The third factor is the quality of the interaction and interrelationship of the child with his parents, siblings, and foster parents. D.C. Code § 16-2353 (b)(3). K.B. has a very affectionate relationship with appellees. He also has a positive relationship with Mr. B., with whom he was typically happy during visits. Dr. Susan Theut, a psychiatrist who performed an interactive evaluation of K.B.'s relationship with appellees and with appellants, testified that K.B. was clearly comfortable in both situations and that there was no significant difference between

his interaction with his foster parents and with his natural parents. She reported that K.B. had a "strong and positive relationship" with both sets of adults. The trial court found that, despite this expert testimony about the interactive evaluations, the third factor still favored placement with appellees as serving K.B.'s best interests, because they "have been meeting [K.B.'s] emotional needs for more than three years." The trial court also took note of the fact that the mother had consented to the adoption as being in the child's best interest. Although the evidence relevant to this factor is not as clearly weighted in favor of adoption as is the evidence related to other factors, it supports the magistrate judge's decision that adoption by appellees is in K.B.'s best interests.

The fourth factor is the child's opinion of his own best interests in the matter. D.C. Code § 16-2353 (b)(4). K.B. was too young to offer his opinion at trial. To the extent that his opinion could be ascertained, however, the trial court noted his close relationship with appellees and that the Guardian Ad Litem supported his adoption by the petitioners. In addition, there is evidence that K.B. recently cried during his visits with the natural parents and would not stop crying until he was returned to the car or brought back to appellees. Thus, to the extent that this factor is relevant, it weighs slightly in favor of the appellees.

Finally, the fifth factor is "evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided pursuant to [D.C. Code § 4-1301.06 (a)]."[13]  D.C. Code § 16-2353 (b)(5). There is no evidence of any drug activity in appellees' home.  As outlined above in the discussion of Mr. B.'s parental fitness, however, there is significant evidence of past and current substance abuse in his home.  Mr. B. has a lengthy history of marijuana use and admitted that he was currently using K2.  Furthermore, Ms. B.

---

[13]  Mr. B. attended a substance abuse group he found on his own and was not required to attend.  The trial court ordered drug testing, mental health evaluations, parenting classes, and weekly visits with K.B.  Those visits were initially supervised; as appellants were initially compliant with the court-ordered services, the visits were changed to unsupervised, progressing to overnight visits at appellants' home.  Mr. B. claims that he was not given sufficient support after Ms. B.'s relapse during one unsupervised overnight visit and his candid acknowledgment that he was unable to care for K.B. by himself, and that instead, the agency immediately changed the permanency goal to adoption.  The record shows otherwise.  When Ms. B. relapsed in August 2013 a change was made to supervised visits.  Mr. B. stopped visiting because he thought the decision to take K.B. away had been made, but he was disabused of that notion in November 2013 and encouraged to visit.  He did not, however, resume his visits because Ms. B. was incarcerated.  The permanency goal was changed to adoption in January 2014. Mr. B. does not specify what services would have permitted him to care for K.B. without Ms. B.'s presence and assistance.  *See In re A.C.*, 597 A.2d 920, 922 (D.C. 1991) (noting that although efforts of custodial agency to reunify family are relevant, agency's failings "do not preclude termination, if in the child's best interest").

also lives in the home, and her alcoholism was not in remission. This factor clearly weighs in favor of placing K.B. with appellees.[14]

The trial court found by clear and convincing evidence that the relevant statutory factors weighed in favor of placing K.B. with appellees, after properly denying Mr. B. the presumption that K.B.'s best interests would be served by placement with his natural parent. "Evidence of continued drug activity" — which was undisputed in this case — "shall be given great weight." D.C. Code § 16-2353 (b)(5). It was therefore not an abuse of discretion for either the magistrate judge or the associate judge to conclude that it was in K.B.'s best interests to terminate Mr. B.'s parental rights and place K.B. with appellees.

## III.

Adoption, as discussed above, requires the consent of a natural parent, or the court's waiver of the parent's consent. D.C. Code § 16-304 (a). Consent, once given, "is irrevocable absent a showing that it has been given involuntarily." *J.M.A.L. v. Lutheran Soc. Servs. of the Nat'l Capital Area, Inc.*, 418 A.2d 133, 135

---

[14] A sixth factor, whether the child was left in the hospital after birth despite a medical determination that the child could be discharged, was not relevant to this case. *See* D.C. Code § 16-2353 (b)(3A).

(D.C. 1980); *see also* Super. Ct. Adopt. R. 70.[15]  To be voluntary, consent must be made without coercion, fraud, or mistake.  *J.M.A.L.*, 418 A.2d at 136.  On review of the trial court's determination that consent was given voluntarily, we assess whether the finding is supported by the record and is not clearly erroneous.  *See id.* (whether finding is "plainly wrong or without evidence to support it"); *In re S.E.D.*, 324 A.2d 200, 201 (D.C. 1974).

Ms. B. claims that the consent she gave in court on January 14, 2015, was involuntary because she lacked sufficient advice of counsel.  She also claims that her incarceration and her emotional state of mind during the court's *voir dire* indicated that she was not voluntarily consenting to the adoption, and that she was pressured into giving consent in exchange for the Post-Adoption Contract Agreement as her only option for maintaining contact with K.B.  Both the

---

[15]    A consent to adoption may be revoked or withdrawn only after a judicial determination that the consent was not voluntarily given.  The person moving to withdraw or revoke consent has the burden of proof to establish that the consent was not voluntarily given.  The Court shall set a separate hearing to determine whether to permit revocation of a consent.  If revocation or withdrawal of consent is permitted, the Court shall proceed on an expedited basis to determine whether consent is being withheld contrary to the best interests of the child pursuant to D.C. Code § 16-304 (e).

Super. Ct. Adopt. R. 70 (a).

magistrate judge and the associate judge considered these arguments and found that Ms. B.'s consent was voluntary. On the record before us, we have no basis to reverse their determination.

Ms. B. had a statutory right to the effective assistance of counsel in a proceeding that could lead to termination of her parental rights. *See In re R.E.S.*, 978 A.2d 182, 188 (D.C. 2009) (citing D.C. Code § 16-2304 (b)(1)); *see also Lassiter v. Department of Soc. Servs.*, 452 U.S. 18, 32 (1981) (holding that because of fundamental liberty interest at stake in proceeding leading to termination of parental rights, due process might require appointment of counsel, a determination to be made on a case-by-case basis). In determining whether the protection afforded by her right to counsel has been satisfied, we apply the familiar two-step standard developed for criminal proceedings, which considers whether the lawyer's performance has been deficient and, if so, whether the client was prejudiced as a result. *See In re R.E.S.*, 978 A.2d at 191 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).[16]

---

[16] Claims of ineffective assistance of counsel should be raised on direct appeal, preferably by motion "as soon as possible," and no later than "within one year following the date the final decree became effective." *In re R.E.S.*, 978 A.2d at 193 (quoting D.C. Code § 16-310 (2001)); *see In re R.E.S.*, 978 A.2d at 193 nn.9-10 (noting possibility that claim of ineffectiveness could also be brought in Superior Court pursuant to Super. Ct. Adopt. R. 60 (d)). Ms. B. did not file a

(continued . . .)

Two days before she gave her consent, Ms. B. asked for new counsel, or another lawyer to assist her counsel, but she gave no reason for her request other than that she preferred that another lawyer be involved in her representation. The trial court denied the request, noting that Ms. Graham was doing well in her representation of Ms. B., and that a change of counsel at that time would result in delay. At the hearing on the motion to revoke her consent, Ms. B. claimed that her lawyer did not "give [her] all the information." On appeal, Ms. B. adds that she was not advised about the "positive and negative factors" that the court would have to consider in deciding whether to waive her consent to adoption. There is no evidence to support these claims other than Ms. B.'s bare assertions.[17] The trial transcript supports a contrary inference. Ms. Graham informed the court that she and Ms. B. had "talked about [the consent] at length" throughout that week. When Ms. B. told the court she wanted to consent, the trial court immediately recalled that she had requested another lawyer, and asked Ms. B. several times if she had had advice of counsel in giving her consent. Each time Ms. B. answered, "Yes."

_____

(. . . continued)

motion, but her brief raising questions about her counsel's representation was filed on July 22, 2016, well within a year of the final decree of adoption, which was approved by the Superior Court on February 4, 2016. Although her brief on appeal does not specifically rely on the *Strickland* factors, her argument amounts to a claim that her counsel's deficiencies led her to make a decision to consent that she otherwise would not have made.

[17] Ms. Graham was not called to testify at the revocation hearing.

She did not renew her request for different counsel. As for Ms. B.'s claim that Ms. Graham told her that consenting was the only way she would get to see her son, Ms. B. offered no evidence of this other than her uncorroborated testimony, which the magistrate judge did not find credible. The trial court's finding that Ms. B. did have advice of competent counsel in deciding to consent to the adoption was reasonably supported by the record.

The trial court also found that neither Ms. B.'s incarceration at the time nor her emotional distress rendered her consent involuntary. Consenting to the adoption of her son was obviously a difficult and profoundly distressing decision for Ms. B.[18] The trial court was aware of this and responded with sensitivity. As Ms. B. became increasingly upset while the court conducted the questioning about her decision to consent, the court gave her time to compose herself, and stated, "I can see that you are upset right now, and I don't want you to necessarily make a decision of this importance that you're not sure of." The court asked Ms. B.

_____

[18] Because the transcript of the hearing contained a number of indications of pauses during which Ms. B.'s testimony was interrupted, this court obtained a copy of the recording to have a more complete understanding of what transpired during the proceeding. Ms. B. is heard to be crying, sobbing at times, and evidently distressed. But she collected herself and was able to respond to the trial court's questions without once denying her intent to consent. A wrenching decision of this kind is heartbreaking for a parent, and it must have been very hard to accept that Ms. B.'s personal circumstances were such that adoption was the best option for her child. But it does not mean it was not her choice.

several times if she was sure she wished to consent, and specifically asked if she felt pressured to do so.[19]  Although Ms. B. wondered whether "one relapse" was "serious" and sufficient to lose her "sweet baby," each time the judge inquired, she affirmed that she was consenting to the adoption.  Her testimony at the hearing to revoke her consent, that she was "not really all together"[20] and did not know how long she might be incarcerated, reflects the difficult circumstances in which she found herself at the time, but it does not override the trial court's finding, based on first-hand observations, that her consent was voluntary.  As the trial court found, Ms. B. understood the legal consequences of her decision, and, after having heard the evidence at trial, made a "strategic choice" to consent to the adoption.

The evidence also belies the contention that Ms. B. was pressured to consent in exchange for the Post-Adoption Contact Agreement that would permit her to

---

[19]  In response to the court asking if she felt pressured to consent, Ms. B. gave a non-verbal response that the court interpreted as shaking her head.

[20]  On appeal, Ms. B. contends that because the court was aware of her mental illness and alcohol dependence, the court should have made further inquiry about her present mental condition and whether she had taken her medications that day.  Ms. B.'s testimony up to that point, however, was that she was one hundred percent dedicated to her sobriety, was taking her medication, and that her seizures were being effectively controlled.  Thus, there was no reason for the court to inquire further into her mental clarity or competence to consent, beyond the court's questioning about her willingness to consent and her understanding of the legal implications of consent to adoption.

have continuing contact with K.B. At the time she gave her consent in open court, Ms. B. asked to address the judge directly and told the judge that she "wanted the best for [her] son" and that she wanted to consent because she believed it would be in K.B.'s best interest. Ms. B. testified at the hearing on her motion to revoke her consent that Ms. Graham pressured her into consenting as the only way she could have future contact with K.B. The magistrate judge, who was in the best position to "observe [Ms. B.'s] demeanor and form a conclusion" about her credibility, *In re P.S.*, 797 A.2d 1219, 1224 (D.C. 2001), did not find this assertion credible.

There is also no evidence that appellees would withhold the promise of continued contact with K.B. unless Ms. B. consented to the adoption. On the contrary, appellees were clearly open to maintaining a relationship between K.B. and appellants even before Ms. B. consented to the adoption. Two days before Ms. B. consented, P.O. had testified that if the adoption petition were granted, "[W]e do think that [K.B.] should have some contact with his birth parents. We, that's what we wanted . . . I want [our adopted children] to know who their biological parents are, and I want them to have a good healthy relationship with them."[21] The

---

[21] Other evidence in the record corroborated that the adoptive parents intended that K.B. have contact with his natural parents. The adoptive parents have one adopted child and were in the process of adopting another. P.O. testified that the adopted child had a continuing relationship with his birth mother and that

(continued . . .)

Post-Adoption Contact Agreement itself, which Ms. B. signed the same day that she consented, states that the agreement was entered into voluntarily and that nothing was promised in exchange for any of the parties' signatures.

At the hearing on Ms. B.'s motion to revoke her consent, the court found that Ms. B. "clearly made a determination, with the advice of counsel . . . as to whether or not she believed she would prevail at trial[,] and I think that went into her determination as to whether or not to consent to the adoption." As a result, the trial court found that Ms. B. consented to the adoption "strategically after sitting through the entirety of a four day trial in an effort to preserve the possibility of future contact with her son," and not because she was coerced into doing so. That Ms. B. evaluated her chances of prevailing in deciding whether to consent was a reasonable approach, well-founded on the evidence presented at trial. It does not detract from Ms. B.'s stated reason, as a mother who loves her son, that she was doing so because she thought adoption to be in the best interests of the child. On

_____
(. . . continued)
she wished the same for K.B. Thus, Ms. B. had reason to believe they would offer the same treatment to K.B.'s natural parents even without receiving Ms. B.'s consent to the adoption.

this record, we have no basis to reverse the magistrate judge's finding, affirmed by the associate judge, that Ms. B.'s consent to the adoption was voluntary.[22]

## IV.

We hold that the trial court did not abuse discretion in its determination that Mr. B. was not able to care for K.B. and that withholding his consent to adoption by the petitioners was contrary to the child's best interests. We also hold that the trial court did not clearly err in finding that Ms. B.'s consent to the adoption was voluntary. Therefore, the associate judge's Orders affirming the magistrate judge's Orders and Final Decree of Adoption are affirmed.

*So ordered.*

---

[22] Ms. B.'s brief on appeal asserts that there is no Post-Adoption Contact Agreement with Mr. B., who did not consent to the adoption. We are urged to infer that the reason is that Ms. B.'s consent was the *quid pro quo* for her Contact Agreement. There is no evidence in the record with respect to whether Mr. B. has (or does not have) a Post-Adoption Contact Agreement or in fact has continuing contact with K.B.