Concurring opinion by Associate Judge Easterly at page 778.
Opinion concurring in the judgment by Senior Judge Ferren at page 779.
Per Curiam:
*773 In December 2015, at age fourteen, B.E.L.S. entered the United States illegally from Guatemala in the company of human smugglers to join appellant, his father, who has resided in the United States since 2007. Appellant challenges the trial court's December 22, 2016, order denying his unopposed motion for findings pursuant to District of Columbia law that would allow him to petition the United States for Special Immigrant Juvenile Status ("SIJS") for B.E.L.S. under 8 U.S.C. § 1101 (a)(27)(J) (2009 Supp. II).[1] We agree with the trial court's findings that B.E.L.S. was eligible for SIJS, and that it would not be in B.E.L.S.'s "best interest to be returned" to Guatemala.[2] We discern reversible error, however, in the court's finding that B.E.L.S.'s reunification with his mother in Guatemala would be "viable."[3] Accordingly, we reverse and remand the case for the trial court to enter judgment that B.E.L.S. qualifies to petition for SIJ status.
I. The Facts
In November 2015, B.E.L.S.'s mother placed him in the company of human smugglers, who took him to the United States border, where he crossed into Texas in December and was "caught" by immigration enforcement. The terms of his release are not clear, but by January 2016, he had arrived in Washington, D.C. to live with appellant.
B.E.L.S. testified that he "came to the United States" for "better opportunities to study." He added that on two occasions prior to his departure gang members had asked him to "sell cocaine and marijuana," and that he had feared they "would harm" or even "kill" him because of his refusal to do so. B.E.L.S. and appellant both stated that the boy's mother had sent him away with human smugglers because she believed that "the police would not do anything" about the gang threat.[4] B.E.L.S. testified that his run-ins with gang members had occurred first in September 2014 and again in October 2015, thirteen months after the first approach and one month before he left home.
As to his home life, B.E.L.S. testified that he had lived with his mother and two of his younger siblings in Guatemala. Appellant and B.E.L.S. both testified that, although his mother "always is sick" and is therefore unemployed, appellant supported the family when B.E.L.S. was in Guatemala, supports B.E.L.S. now, and continues to support B.E.L.S.'s mother and siblings living with her in Guatemala.
*774 B.E.L.S. presently keeps in touch with his mother through weekly phone calls.
II. The Trial Court's Ruling
The trial court ruled that B.E.L.S. had satisfied three of the four statutory and regulatory criteria allocated by federal law to the District of Columbia Courts for making SIJS findings: (1) B.E.L.S. was under the age of twenty-one years and unmarried at the time of his request;[5] (2) B.E.L.S. had been placed, pursuant to a concurrent order of the court, in the sole legal and physical custody of his father in the District of Columbia,[6] with "a reasonable right of visitation" for his mother "per agreement between" her and appellant; and (3) it was not in B.E.L.S.'s "best interest" to be returned to Guatemala.[7] The trial court also ruled, however, that there was "no credible evidence that reunification with BELS's mother is not viable," thereby rejecting the petition for SIJS findings under 8 U.S.C. § 1101 (a)(27)(J)(i).[8] The court offered several reasons for this conclusion.
As to B.E.L.S.'s family life, the trial court found no credible evidence that "his mother abused, neglected or abandoned BELS in Guatemala before [she] sent him to live with his father in the United States." The court also noted that "BELS and his mother have maintained a parent-child relationship since his arrival in this country"; indeed, "[t]hey converse on the telephone every Saturday." Furthermore, said the court, the mother's health "does not make it impossible" for her to care for B.E.L.S., as "she is currently caring for two of [his] siblings despite her reported health concerns." Nor did the court find any "reason to believe that she would be unable to care for" B.E.L.S., as appellant continues to provide financial support for her and B.E.L.S.'s two siblings remaining in Guatemala in their mother's care.
Despite this benign view of B.E.L.S.'s past and future home life with his mother, the trial court found that it was not in B.E.L.S.'s "best interest to return to Guatemala" because B.E.L.S. would have "better employment and educational opportunities" in the United States as well as "a better quality of life ... distant from the public safety concerns in Guatemala." This "best interest" finding was obvious to the court, despite its finding that B.E.L.S. had not lived under the gang threat in Guatemala that he allegedly feared.[9]
*775 The trial court addressed-and rejected-the alleged gang threats exclusively in connection with its analysis of B.E.L.S.'s "best interest";[10] the court did not reference Guatemalan gangs when ruling on appellant's claims of "neglect" and "abandonment" by the boy's mother premised on her entrusting him to human smugglers.[11] These latter claims, however, were premised on B.E.L.S.'s gang threat testimony and the mother's response, and this appeal challenges the trial court's failure to address that alleged connection.
III. Appellant's Argument
Appellant contends that reunification of B.E.L.S. with his mother would not be viable because she has "neglected" and "abandoned" him according to District of Columbia law (applicable as "State" law incorporated into the SIJS statute).[12] Specifically, "by sending [B.E.L.S.] away" with "an unknown human smuggler," his mother has failed "to take care of him" (neglect) and to maintain "their relationship" (abandonment). She ignored "safer alternatives" to remove B.E.L.S. from the alleged gang threat, such as contacting the police or relocating B.E.L.S. "internally" (in Guatemala) with the money she used to hire the smuggler. Nor did she attempt to find a trusted adult to accompany and protect B.E.LS. on the journey. In any event, adds appellant, B.E.L.S.'s mother is "unable to care for him as she is ill and unemployed." Accordingly, argues appellant, B.E.L.S.'s reunification with his mother "is not viable because of abandonment and neglect" -grounds which, he says, the trial court erroneously rejected.
IV. Analysis
A. Standard of Review
We review "the trial court's decisions on appeal for abuse of discretion, errors of law, and clear lack of evidentiary support. In reviewing for abuse of discretion, this court considers whether the trial court exercised its discretion within the range of permissible alternatives, based on all relevant factors and no improper factor."[13] We review the trial court's legal determinations de novo and its "findings of fact ... for clear error."[14] Overall, the decision of the trial court "must provide substantial reasoning that is based on correct legal principles and has a firm factual foundation in the record."[15]
B. SIJS Standard of Proof
The SIJS statute does not announce a federal standard of proof,[16] and "[t]here is nothing in" the U.S. Citizenship and Immigration Services ("USCIS") "guidance that should be construed as instructing juvenile courts on how to apply *776 their own state law."[17] Because our trial courts, unless otherwise specified, generally apply the preponderance standard in civil cases,[18] including family matters,[19] we conclude that the SIJS statute required appellant to demonstrate by a preponderance of the evidence that B.E.L.S.'s reunification with his mother was "not viable" under District of Columbia law.[20]
C. This Case
After hearing testimony from both father and child (appellant and B.E.L.S.), the trial court, in adjudicating subsection (i) of the SIJS statute,[21] concluded that B.E.L.S. had presented "no credible evidence ... that his mother abused, neglected or abandoned [B.E.L.S.] in Guatemala before his mother sent him to live with his father in the United States."[22] We perceive no record basis for second-guessing the court's findings that B.E.L.S.'s mother had not "abused" him. On the facts here, however, "neglect" and "abandonment" require extended analysis.
1. Neglect and Abandonment
The question before us-in aid of an ultimate determination by federal authorities as to whether B.E.L.S. should be allowed to remain in the United States-is whether B.E.L.S.'s mother "neglected" or "abandoned" him by sending him on a long and dangerous journey with human smugglers from Guatemala to the Texas border in the hope of reuniting the boy with his father in the District of Columbia. We have previously noted the difficulties that such a task imposes upon a state judge.[23] Such proceedings, as in this case, are normally unopposed and involve factual questions in the home country thousands of miles away. Furthermore, the state court is asked to make the determination in a context quite foreign to its normal responsibilities-indeed, to make a determination informed by the realization that, when refusing to make the findings required for SIJ status, the court's decision is, in effect, a negative immigration decision.
Accordingly, when determining whether a petitioner has established a prima facie case, the trial court must recognize that Congress to some extent has put its proverbial thumb on the scale favoring SIJS status. "The purpose of the law is to *777 permit abused, neglected, or abandoned children to remain in this country."[24] And, in establishing the requirements for SIJS status, Congress knew that there would be proof problems, i.e., "that those seeking the status would have limited abilities to corroborate testimony with additional evidence."[25] For that reason, a trial court's imposition of "insurmountable evidentiary burdens of production or persuasion" on an SIJ petitioner would be "inconsistent with the intent of the Congress."[26] Therefore, in this international-not merely District of Columbia-environment, all the relevant factors must be understood in the light most favorable to determinations of neglect and abandonment, with an eye to the practicalities of the situation without excessive adherence to standards and interpretations that might normally apply in strictly local contexts.[27]
Under District of Columbia law, a "neglected child" includes a child [1] "who has been abandoned or abused by his or her parent" or [2] "whose parent ... has failed to make reasonable efforts to prevent the infliction of abuse upon the child."[28] A court may infer abandonment if a parent "has made no reasonable effort to maintain a parental relationship with the child for a period of at least four (4) months."[29]
In this case, B.E.L.S's mother: (1) retained a "right of visitation" in her custody agreement with the boy's father; and (2) has regular Saturday phone calls with her son here in the District. Therefore, if this were a strictly local case in the District of Columbia, based on these two indicia of parental connection we could not say that B.E.L.S.'s mother had "failed to make a reasonable effort to maintain a parental relationship" with her son. But, in this alleged international abandonment case, in which the trial court determined that sole physical and legal custody should be given to B.E.L.S.'s father, the boy's mother-as a practical matter-retained only theoretical visitation rights, at least for the foreseeable future; she had no more than a diluted parental relationship-a relationship that no "reasonable effort" could make normal. The mother's sending her son away with smugglers to a foreign land, at substantial risk to his life,[30] forced a physical separation from B.E.L.S. that not *778 even the child of an incarcerated felon would necessarily have to endure. All things considered, therefore, it is no stretch, if one is realistic, to conclude-as we do here-that a parent who sends a child off on such a journey to the United States has "abandoned" the child to the uncertain fate awaiting every child on such a highly dangerous passage.
Having decided that B.E.L.S.'s mother has abandoned him as a matter of law on this record, we need not review her actions under the second clause of the neglect statute quoted above.[31]
2. Viability of Reunification
We thus turn to the final question: whether B.E.L.S.'s reunification with his mother after a forced return to Guatemala would be "viable," a foreseeability inquiry that focuses on "the workability or practicability of a forced reunification."[32] We conclude that such return would not be viable. Although the trial court rejected B.E.L.S.'s testimony that a gang had twice threatened him after he refused to sell drugs,[33] the court did not question the boy's underlying assertion that the gang on both occasions had asked him to do so; nor did the court express doubt that B.E.L.S.'s mother was motivated by gang concerns when she sent him away with smugglers within a month after the second gang request-evidence that, upon the gang's resurgence after a year's dormancy, she reasonably feared for her son's safety. It is therefore reasonable to assume that, given the mother's perception of continuing gang danger to B.E.L.S. if he were to return to Guatemala, the risk is obvious: his mother might well attempt a second, similar abandonment. We therefore conclude, in the words of the statute, that B.E.L.S.'s forced "reunification" with his mother would be "not viable."[34]
* * * * *
For the foregoing reasons, the court's order of December 22, 2016, is vacated. We remand the case for entry of judgment forthwith granting appellant authority to petition the United States for Special Immigrant Juvenile Status for B.E.L.S. on grounds of "abandonment" pursuant to 8 U.S.C. § 1101 (a)(27)(J) (2009 Supp. II).
Reversed and remanded.

Section 1101 (a)(27)(J)(i)-(iii) provides in relevant part:
[A special immigrant juvenile is] an immigrant who is present in the United States-(i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law ; (ii) for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; and (iii) in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status[.]
(emphasis added).

Id.

Id.

B.E.L.S. specifically stated that his mother had refused to enlist help from the police "because [they] were turn coats and they would [s]ell themselves for money."

8 C.F.R. § 204.11 (c)(1)-(2) (implementing SIJS statute, supra note 1).

See 8 U.S.C. § 1101 (a)(27)(J)(i), supra note 1.

See 8 U.S.C. § 1101 (a)(27)(J)(ii), supra note 1.

See supra note 1.

Primarily because "nothing happened" to B.E.L.S. during the thirteen months between the two alleged gang threats, the court disbelieved B.E.L.S.'s testimony that "gang members [had] threatened BELS before he left Guatemala" or would "threaten BELS should he return to Guatemala." Indeed, the court perceived that B.E.L.S. had "embellished" his gang threat testimony. When asked by counsel if he knew what gang had approached him, B.E.L.S. initially replied, "No, they never told me." When he was then asked how he knew they were gang members, he responded, "Because they have tattoos on them," from "the 18th" Street Gang. By B.E.L.S. first denying he knew the name of the gang, then naming it upon further questioning by his lawyer, the trial court apparently believed that the boy was responding to coaching. Later, on redirect examination, in response to counsel's question why B.E.L.S. believed that the gang members would harm him, he first replied, "Because that's what they were telling me." When counsel followed by asking B.E.L.S. whether they had "guns" ("No") or "weapons," he said that they had "Knives"-another answer the court believed was an embellishment triggered by a leading question from B.E.L.S.'s counsel.
The foregoing finding that a gang had not threatened B.E.L.S. seems more than a little strained, but because B.E.L.S appeared personally before the court and we have no more than the written record to scrutinize, we cannot say that the trial court's finding was clearly erroneous. See, e.g. , In re J.C.F. , 73 A.3d 1007, 1012-13 (D.C. 2013).

8 U.S.C. § 1101 (a)(27)(J)(ii), supra note 1.

8 U.S.C. § 1101 (a)(27)(J)(i), supra note 1.

See supra note 1.

In re J.O. , 176 A.3d 144, 153 (D.C. 2018) (citation and internal quotation marks omitted).

Id. ; see D.C. Code § 17-305 (a) (2012 Repl.); E.P.L. v. J.L.-A. , 190 A.3d 1002, 1006 (D.C. 2018).

In re J.O. , 176 A.3d at 153 (internal quotation marks omitted).

See generally J.U. , 176 A.3d at 140-41 (looking to District abuse and neglect statutes for guidance).

USCIS Policy Manual , Vol. 6, Pt. J, Ch. 2 (D)(4) (Dec. 12, 2018), https://www.uscis.gov/policymanual/HTML/PolicyManual-Volume6-PartJ-Chapter2.html.

In re E.D.R. , 772 A.2d 1156, 1159 (D.C. 2001) ("[I]n most civil cases this court requires only a preponderance of the evidence as the standard of proof.").

See, e.g. , D.C. Code §§ 16-914 (f)(2) (2012 Repl.) (establishing "preponderance of the evidence" standard for proceedings between parents to modify custody), -2317 (b)(2) & (c)(2) (2012 Repl.) (establishing "preponderance of the evidence" standard for child neglect proceedings); In re P.B. , 54 A.3d 660, 665-66 (D.C. 2012) (applying "preponderance of the evidence" standard to child neglect proceeding).

We recognize situations in which the court must establish that a child was abused, neglected, or abandoned by "clear and convincing evidence." D.C. Code §§ 16-831.06(b) (2012 Repl.), -831.07(a) (2012 Repl.) (third-party custody proceeding); see also In re E.D.R. , 772 A.2d at 1159 (recognizing clear and convincing standard "when there is a liberty or fundamental interest at stake, such as in cases involving termination of parental rights"); cf. In re Guaman , 879 N.W.2d 668, 672-73 (Minn. Ct. App. 2016) (considering need to make SIJS findings under state law framework with a clear and convincing evidence standard.)

See supra note 1.

Nor did the trial court identify a "similar basis" for mistreatment.

See J.U., 176 A.3d at 141 n.9.

In re Dany G. , 223 Md.App. 707, 117 A.3d 650, 655 (2015).

In re J.A. , 2017 WL 4876779, at *4 (Md. Ct. Spec. App. Oct. 30, 2017) (quoting In re Dany G. , 117 A.3d at 655-56 ).

Id. (quoting In re Dany G. , 117 A.3d at 655-56 ); accord In re Domingo C.L. , No. 2016-M-02383, 2017 WL 3769419, at *4 (Tenn. Ct. App. Aug. 30, 2017).

See Benitez v. Doe , 193 A.3d 134, 139 (D.C. 2018) ("caution[ing] the trial court[s] against imposing ... insuperable evidentiary burdens on SIJ status applicants").

D.C. Code § 16-2301 (9)(A) (2012 Repl.).

D.C. Code § 16-2316 (d)(1)(C) (2012 Repl.).

"Smuggled children embarking on the journey to the United States face considerable risks, not only from exposure to the elements and the dangers of riding atop trains, but also from gangs, smugglers, and police who frequently rob, extort, brutally attack, rape, and even sometimes kill them ...." In re Amandeep S. , No. G-1310, 44 Misc.3d 1201(A), 2014 WL 2808690, at *13 (N.Y. Fam. Ct. June 19, 2014) (internal brackets and quotation marks omitted); cf. W.R.A.H. v. D.M.A.H. , No. A-4440-16T2, 2018 WL 3339801, at *3 (N.J. Super. Ct. App. Div. July 9, 2018) (parent who "deliberately allowed [her child] to flee Guatemala unaccompanied for a two month trek north" held to have "abandoned or neglected" child under New Jersey law; court cited "considerable perils potentially visited upon an unaccompanied minor [trekking] to the United States from Central America," even though the sending parent may have had the minor's "best interest in mind").

See text accompanying supra note 28.

J.U. v. J.C.P.C. , 176 A.3d 136, 141 (D.C. 2018) ; see id. at 143 (referring to "the flexibility of the [viability] concept depending on the context for which the determination is being made").

See supra note 9.

See supra note 1.