# IN THE SUPREME COURT OF CALIFORNIA

Guardianship of SAUL H.

_____

SAUL H.,
Petitioner and Appellant,
v.
JESUS RIVAS et al.,
Real Parties in Interest.

S271265

Second Appellate District, Division One
B308440

Los Angeles County Superior Court
19AVPB00310

---

August 15, 2022

Justice Groban authored the opinion of the Court, in which Justices Corrigan, Liu, Kruger, Jenkins, and Guerrero concurred.

Chief Justice Cantil-Sakauye filed a concurring opinion.

---

Guardianship of SAUL H.

S271265


Opinion of the Court by Groban, J.


Saul H. left his native El Salvador at the age of 16, fleeing gang violence. Saul's parents started sending him to work in the fields in the summers when he was 10 years old. When Saul was 15, his parents made him stop going to school after gang members twice approached him outside of class, attempted to recruit him, and when he refused to join, threatened to kill him and his family. Saul then got a job to help provide food for his family, but a gang member approached him there too, threatening to "disappear" him unless he paid a gang "tax." Saul eventually left El Salvador on his own, against the wishes of his parents.

In the United States, a distant relative took Saul in and agreed to serve as his guardian. Saul petitioned the probate court to issue the predicate findings he needs to support an application to the federal government for special immigrant juvenile status, which allows qualifying immigrants under the age of 21 to seek lawful permanent residence. (Code Civ. Proc., § 155 (section 155); 8 U.S.C. § 1101(a)(27)(J).) In support of his petition, Saul submitted a declaration describing the dangers and deprivations he faces in El Salvador, his parents' inability to provide for and protect him, and the safety and happiness he has found in his guardian's care.

The probate court denied Saul's petition. The court determined that because his parents' inability to provide for and

protect him was due to their poverty, Saul could not establish reunification with his parents was "not . . . viable because of abuse, neglect, abandonment, or a similar basis pursuant to California law." (§ 155, subd. (b)(1)(B).) The court further declined to find that it would not be in Saul's "best interest . . . to be returned to" El Salvador. (*Id.*, subd. (b)(1)(C).) It speculated that Saul would not face the same hardships if forced to return because, now 18, he was "no longer a minor" and observed that some Salvadoran youth avoid gang violence and grow up to be professionals. Saul appealed and the Court of Appeal affirmed. (*Guardianship of S.H.R.* (2021) 68 Cal.App.5th 563, 573–574, 583 (*S.H.R.*).)

We granted review to provide guidance on the statutory requirements governing California courts' issuance of special immigrant juvenile predicate findings. We conclude the probate court applied an incorrect legal framework in ruling on Saul's petition. Applying the correct framework, we hold that it is not viable to reunify Saul with his parents because he would face a "substantial risk" of "serious physical harm" as a result of his parents' failure or inability to adequately protect him. (Welf. & Inst. Code, § 300, subd. (b)(1).) This is a "similar basis pursuant to California law" for the nonviability of reunification finding. (§ 155, subd. (b)(1)(B).) We further hold that returning Saul to live in El Salvador would be detrimental to his health, safety, and welfare, and therefore contrary to his best interest under California law. (Fam. Code, §§ 3020, subd. (a), § 3011, subd. (a)(1).) Accordingly, we reverse the Court of Appeal's judgment and direct that the case be remanded to the probate court for issuance of special immigrant juvenile predicate findings.

# I. BACKGROUND

## A. Special Immigrant Juvenile Status

Congress created the special immigrant juvenile (SIJ) classification in 1990 to protect certain immigrant children and allow them to remain in the United States when it would not be in their best interests to be returned to their home countries. (Immigration Act of 1990, Pub.L. No. 101-649, § 153 (Nov. 29, 1990) 104 Stat. 4978, § 153; *Bianka M. v. Superior Court* (2018) 5 Cal.5th 1004, 1012 (*Bianka M.*).) As amended, the law permits an immigrant " 'child' " —  a term defined as "an unmarried person under twenty-one years of age" (8 U.S.C. § 1101(b)(1)) — to apply for special immigrant juvenile status if: (1) the child is a dependent of a juvenile court, in the custody of a state agency by court order, or in the custody of an individual or entity appointed by the court; (2) it would not be viable to reunify the child with one or both parents because of "abuse, neglect, abandonment, or a similar basis found under State law;" and (3) "it would not be in the [child's] best interest to be returned to the [child's] or parent's previous country of nationality or country of last habitual residence."  (*Id.*, § 1101(a)(27)(J)(ii).) Each of these predicate findings must be made in state court proceedings.  (*Bianka M.*, at p. 1013.)  A state court order containing these findings is a required component of an immigrant child's application to United States Citizenship and Immigration Services for special immigrant juvenile status, which allows the child to seek lawful permanent residence in the United States.  (*Ibid.*)

In 2014, the California Legislature enacted Code of Civil Procedure section 155. (Stats. 2014, ch. 685, § 1.) Section 155 clarifies that superior courts "have jurisdiction to make the

factual findings necessary to enable a child to petition the United States Citizenship and Immigration Services for classification as a special immigrant juvenile." (§ 155, subd. (a)(1).) From its enactment, section 155 has provided that, on request, a court "shall issue" an order containing SIJ predicate findings if "there is evidence to support those findings." (§ 155, subd. (b)(1).) The Legislature has since acted to facilitate the issuance of SIJ predicate findings to California's immigrant children in several ways. The 2015 enactment of Probate Code section 1510.1 aligned California law with federal law by authorizing courts to "appoint a guardian of the person for an unmarried individual who is 18 years of age or older, but who has not yet attained 21 years of age, in connection with a petition to make the necessary findings regarding special immigrant juvenile status." (Prob. Code, § 1510.1, subd. (a)(1); as added by Stats. 2015, ch. 694, § 3, and subsequently amended.) In 2016, the Legislature amended section 155 to clarify that the evidentiary support for SIJ predicate findings "may consist solely of" the child's declaration and that a court may not deny a petition based on its conclusion that the child's primary motivation in invoking the court's jurisdiction is immigration related. (Stats. 2016, ch. 25, § 1; see *Bianka M., supra*, 5 Cal.5th at p. 1024.)

## B. Factual Background

With this legal background in mind, we now turn to the facts of Saul's case, which are taken from the declaration he

submitted in support of his petition for SIJ predicate findings under section 155.[1]

Saul was born in El Salvador on December 2, 2001, and lived there until, at the age of 16, he left his home and family and set out for the United States. In El Salvador, Saul lived with his parents, five siblings, and maternal grandfather. His parents and grandfather were not working, though his father had been looking for work for a couple of years. The family depended for income on Saul and his two older sisters, who left for the United States a few months before he did.

Saul's parents began sending him to work in the fields with his grandfather during the summers when he was 10 years old. Saul would harvest fruit and vegetables for six to seven hours every day, which left him completely exhausted. His grandfather gave him some money for his work, which Saul used to buy necessities, such as food, clothing, and shoes.

When Saul was in the ninth grade, gang members began targeting him for recruitment. Two men with tattoos of devil horns approached him outside of class, asked him where he was from, and demanded that he join their gang. When he told them that he did not like gangs and did not want to join, they threatened to kill him and his family. Gang members had killed

---

[1]    In addition to his own declaration, Saul submitted to the probate court a psychological evaluation conducted by a licensed clinical social worker. Saul argues we should consider the information about his experiences in El Salvador and their psychological effects on him that was included in the evaluation, which the probate court and the Court of Appeal did not consider. Because we conclude that Saul's declaration alone is sufficient to support the requested findings, we do not reach this question.

many young people in Saul's neighborhood, and Saul was very afraid. When he got home from school, he told his parents what had happened. His father went to the police, who said they would investigate.

Despite his fear, Saul kept going to school. He wanted to continue his education and graduate. A few weeks later, the same gang members again approached Saul at school and tried to recruit him. When he refused to join the gang, they again threatened to kill him and his family. His father went back to the police and reported the new incident, but the police did nothing and his parents did not follow up.

Saul's parents made him stop going to school and start working. Saul got a job at a car wash. When Saul had been working at the car wash for a few months, a gang member approached him and demanded he pay a "tax," threatening to make him disappear if he did not do so. Afraid, Saul told his parents he wanted to leave El Salvador, but they said it would be too dangerous and insisted he stay.

Because his parents could not protect him from the gangs and did not want him to leave, Saul decided to leave without their knowledge or help. He continued to work at the car wash, in constant fear that gang members would return and kidnap or kill him. He used half his earnings to buy food for his family and saved the rest. When he had saved enough money, Saul left for the United States without telling his parents.

Saul entered the United States as an unaccompanied immigrant minor in August 2018 and was transferred to the custody of the United States Office of Refugee Resettlement. After Saul had spent over five months in a shelter in Brownsville, Texas, federal authorities released him to his

cousin's husband, Jesus Rivas, who lives in California and had agreed to care for him. The following September, Saul filed an unopposed petition in the probate court asking it to appoint Rivas as his guardian, which the court eventually granted.

## C. Procedural Background

On December 3, 2019 — the day after his eighteenth birthday — Saul filed his petition for SIJ predicate findings in the probate court. In the declaration supporting his petition, Saul states that he feels "happy and cared for" because Rivas provides him with food and shelter and ensures he gets health care and can continue his education. Saul expresses his desire to "remain in Rivas's care and graduate from high school." He notes that "[m]y only responsibility for the first time is focusing on my education. I feel safe, far from the threatening gang members." Saul expresses his fear that if he is returned to El Salvador, gangs will come after him with threats of violence or even kill him. He states his belief that he "cannot hide" from the gangs, from which his parents are unable to protect him.

Together with his petition, Saul submitted proposed SIJ predicate findings. Saul proposed the probate court find that reunification with his parents is not viable due to their failure to provide him with adequate care and protection. The proposed findings cited to Welfare and Institutions Code section 300, which allows for dependency jurisdiction when, among other things, "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent or guardian to adequately supervise or protect the child" or a child is "left without any provision for support." (*Id.*, subds. (b)(1), (g).) It also cited to Family Code section 3402, subdivision (a), which

defines "abandoned" as "left without provision for reasonable and necessary care or supervision." Saul further proposed the court find that it is in his best interest to remain in California under Rivas's care, where he feels happy, safe, and protected, rather than be forced to return to El Salvador.

The probate court denied Saul's petition in a written decision, issued after briefing and oral argument, but without an evidentiary hearing. In a hearing on Saul's petition, the probate court expressed the view that in El Salvador "poverty breeds" child labor and violence "[b]ut being poor or living in [an] impoverished country is not a basis to grant a [special immigrant juvenile status] petition." In its written decision, the court declared that Saul's petition "only raises one issue for the Court to decide. Does the poverty of the family, which resulted in Saul being required to leav[e] school and begin working at an early age, qualify as 'neglect' or 'abuse' under California Code of Civil Procedure, Section 155"? Citing to cases involving the termination of parental rights, the court answered this question "no." The court further found that Saul had not shown "abandonment" (§ 155, subd. (b)(1)(B)), employing a definition of that term that required the parent to have intended to abandon the child. Without addressing other provisions to which Saul had cited, the court concluded that Saul was not entitled to a finding that reunification with his parents was nonviable on any similar basis under California law.

The court next turned to whether it would be in Saul's best interest to be returned to El Salvador. The court stated that because Saul is "no longer a minor" and so "no longer reliant on [his] parents for a permanent, safe, stable, and loving environment" it could not conclude the "issues" he had faced in El Salvador when he was younger would "continue to exist."

8

While the court observed that "the United States offers Saul greater benefits" than El Salvador, it noted that Saul "speaks the language and lived there almost his entire life" and he has "both parents, siblings, and grandfather" there. It acknowledged that "there are hardships he will face in his native country (alleged gang issues)," but opined that "El Salvador also produces doctors, lawyers, and other professionals who have been able to avoid these pitfalls" and Saul had no "issues" with "criminal activity" aside from "the alleged requests to join the gangs (which he resisted)."

Saul appealed and the Court of Appeal affirmed. (*S.H.R.*, *supra,* 68 Cal.App.5th, at pp. 573–574, 583.)[2] The court concluded that Saul had the burden of proving the facts supporting SIJ predicate findings by a preponderance of the evidence. (*Id.* at p. 574.) Reasoning that "[b]ecause the trial

---

[2] Amicus curiae California Academy of Appellate Lawyers notes that there has been some confusion concerning when orders denying SIJ predicate findings are reviewable by appeal and when they are reviewable by writ. Reflecting this uncertainty, Saul filed both a notice of appeal from the probate court's order and a petition in the Court of Appeal for writ of mandate or prohibition. (*S.H.R.*, *supra,* 68 Cal.App.5th at p. 573.) The Court of Appeal correctly held that the probate court's order denying SIJ predicate findings was appealable because it "completely dispose[d]" of Saul's petition, leaving "no further issues to be resolved," rendering the order "the equivalent of a final, appealable judgment," and appropriately exercised its discretion to treat Saul's writ petition as his opening brief on appeal and the exhibits as his appellant's appendix. (*Id.* at p. 574; cf. *Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 697 ["A judgment is the final determination of the rights of the parties"].) As the Court of Appeal noted, writ review may be appropriate in other circumstances. (*S.H.R.*, at p. 574.)

court found his evidence did not support the requested findings, [Saul] has the burden on appeal of showing that he is entitled to the SIJ findings as a matter of law," the Court of Appeal further concluded that Saul "has not met his burden." (*Id.* at p. 569.) We granted review.[3]

## II. DISCUSSION

Saul contends the Court of Appeal erred in concluding that petitioners must prove the facts necessary to demonstrate entitlement to SIJ predicate findings by a preponderance of the evidence and in applying the wrong standard of review. He further argues that the probate court misconstrued state and federal law in various ways in denying his petition. We discuss each of these arguments below.

### A. Burden of Proof

Saul first argues the Court of Appeal erred in holding that a petitioner must prove the facts necessary to support SIJ predicate findings "by a preponderance of the evidence." (*S.H.R.*, *supra*, 68 Cal.App.5th at pp. 569, 574.) The Legislature did not specify a burden of proof and, as the Court of Appeal noted, preponderance of the evidence is the default burden of proof for findings of fact in civil cases. (*Id.* at p. 574; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 861; see Evid. Code, § 115 ["Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence"].) We presume the Legislature was aware of this default standard

---

[3] Since no party or amicus curiae had opposed the issuance of SIJ predicate findings, we invited Jeffery E. Raskin and Stefan Love of Greines, Martin, Stein and Richland LLP to brief and argue this case on a pro bono basis in support of the Court of Appeal's holdings. We thank them for their service.

when it enacted section 155. (*People v. Pieters* (1991) 52 Cal.3d 894, 907.) Federal statutes and regulations do not specify a burden of proof to be used by state courts making SIJ predicate findings. (See 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11 (2022).) However, application of a preponderance of the evidence standard is consistent with the practice of federal authorities adjudicating petitions for special immigrant juvenile status and with the practice of California courts in jurisdictional hearings in dependency cases. (See, e.g., *Matter of D-Y-S-C-* (U.S. Citizenship and Immigration Services, Oct. 11, 2019, Adopted Dec. 2019-02) 2019 WL 5260454, p. *2 (*D-Y-S-C-*); Welf. & Inst. Code, § 355, subd. (a).) And courts in other jurisdictions apply a preponderance of the evidence burden of proof in ruling on petitions for SIJ predicate findings. (*Romero v. Perez* (2019) 463 Md. 182, 199 [205 A.3d 903] (*Romero*); *B.R.L.F. v. Zuniga* (D.C. 2019) 200 A.3d 770, 776 (*B.R.L.F.*); *Matter of Guardianship of B.A.A.R.* (Ct.App. 2020) 136 Nev. 494, 499 [474 P.3d 838].) Accordingly, we hold petitioners must prove the facts supporting SIJ predicate findings by a preponderance of the evidence.

Citing to *O.C. v. Superior Court* (2019) 44 Cal.App.5th 76, Saul describes what he is advocating for as a "substantial evidence" standard. (See *id.* at p. 83 [paraphrasing § 155, subd. (b)(1) as providing that "if substantial evidence supports the requested SIJ findings, the issuance of the findings is mandatory"].) Nevertheless, Saul seems to acknowledge that a petitioner must prove the facts supporting SIJ predicate findings by a preponderance of the evidence. His argument focuses not on the burden of proof for factual findings, but instead on how section 155 — the statute authorizing SIJ predicate findings — defines the superior court's task in ruling

on an immigrant child's petition. Though we conclude that preponderance of evidence is the appropriate burden of proof for facts supporting SIJ predicate findings, we agree with Saul that section 155 provides important guidance for the superior court's inquiry in ruling on a petition for such findings, as elaborated below.

First, section 155 specifies that the evidence supporting SIJ predicate findings "may consist *solely* of, but is not limited to, a declaration by the child who is the subject of the petition . . . ." (§ 155, subd. (b)(1), italics added.) The Legislature added the word "solely" to section 155 by amendment. (See Legis. Counsel's Dig., Assem. Bill No. 1603 (2015–2016 Reg. Sess.); see also Stats. 2016, ch. 25, § 1.) By this addition, the Legislature clarified that a child's declaration can, without further evidence, prove the facts needed to support SIJ predicate findings. (Sen. Budget & Fiscal Review Com., Analysis of Assem. Bill No. 1603 (2015–2016 Reg. Sess.) as amended June 13, 2016.) Accordingly, section 155 makes a child's declaration admissible evidence of the facts described within it for purposes of SIJ predicate findings. (§ 155, subd. (b)(1).) If the child's declaration establishes a fact supporting the findings, the findings may be issued without further evidence of that fact.

The Legislature's determination that a child's declaration alone can constitute evidence sufficient to establish eligibility for SIJ predicate findings is consistent with congressional intent. When creating special immigrant juvenile status, "Congress knew . . . 'that those seeking the status would have limited abilities to corroborate [their own] testimony with additional evidence' " because they would be children who had traveled many miles from their homes to escape difficult

circumstances. (*B.R.L.F., supra,* 200 A.3d at p. 777; see, e.g., 8 U.S.C. § 1232(d)(8) [regulations on immigration relief for unaccompanied immigrant children shall account for their "specialized needs" and "address both procedural and substantive aspects of handling" their cases].) As other jurisdictions have observed, "[i]mposing insurmountable evidentiary burdens of production or persuasion" on such children would be inconsistent with the federal statute's child-protective purposes. (*In re Dany G.* (2015) 223 Md.App. 707, 715 [117 A.3d 650] (*Dany G.*); see *B.R.L.F.*, at p. 777; *Romero*, *supra,* 205 A.3d at p. 915.) Accordingly, in exercising their authority to fashion procedures for use in making SIJ predicate determinations, superior courts must remain mindful of the unique features and challenges of such proceedings, which are generally nonadversarial and in which petitioners typically are young, poor, nonnative English speakers who frequently are unrepresented by counsel. (*J.U. v. J.C.P.C.* (D.C.Ct.App. 2018) 176 A.3d 136, 141, fn. 9 (*J.U.*)].)

This is not to suggest a superior court should abdicate its factfinding responsibility. (*Romero, supra*, 205 A.3d at p. 915.) The declarations children submit with their petitions will not always be sufficient to establish eligibility for SIJ predicate findings. Section 155, subdivision (b)(1) states expressly that evidence supporting SIJ predicate findings "is not limited to" the child's declaration. In some cases, for example, clarification of ambiguous or contradictory statements or additional support for conclusory or implausible assertions may be required. When a child's declaration alone does not establish the factual basis for SIJ predicate findings, a superior court may probe deeper to ascertain the child's eligibility, so long as the procedures it employs adhere to the baselines in state and federal law. (*Weiss*

*v. People ex rel. Dept. of Transportation* (2020) 9 Cal.5th 840, 857.) A court may, for example, ask the child to provide additional evidence supporting the findings, such as a supplementary or amended declaration, or may hold an evidentiary hearing. A court may also make a referral to the local child welfare agency to assist in gathering evidence of eligibility for SIJ predicate findings. (Welf. & Inst. Code, §§ 328, 329; Prob. Code, § 1513; Fam. Code, § 3027, subd. (b); Judicial Council of Cal., Memorandum to Presiding Judges of the Superior Courts and Court Executive Officers of the Superior Courts re Senate Bill 873 and the Special Immigrant Juvenile Process in the Superior Courts (Sept. 30, 2014) p. 15.) When a factual assertion in a child's declaration is contradicted by evidence in the record that a court finds more credible or persuasive, a court may make a factual finding contrary to the assertion. When it does so, a court should make a record of its reasons for rejecting the child's factual assertion to facilitate appellate review.

However, superior courts may not ignore or discredit facts shown by a child's declaration based on surmise or on evidence outside the record or draw speculative inferences against the child. Were a court permitted to do these things, the effect would be to require the child to submit evidence beyond a declaration even when the declaration establishes the facts necessary to support SIJ predicate findings. (See *Leslie H. v. Superior Court* (2014) 224 Cal.App.4th 340, 352 (*Leslie H.*) [reversing denial of petition for SIJ predicate findings where "court based its finding on anecdotal impressions, untethered to any evidence in this case"].) Such an approach would be inconsistent with the Legislature's determination that the

evidence supporting SIJ predicate findings "may consist solely of" the child's declaration.  (§ 155, subd. (b)(1).)

Second, section 155 specifies that "[t]he asserted, purported, or perceived motivation of the child seeking classification as a special immigrant juvenile shall not be admissible in making the findings under this section" and shall not be referenced by the court in ruling on a petition for SIJ predicate findings.  (§ 155, subd. (b)(2).)  This provision acknowledges that state "trial judges are *not* gatekeepers tasked with determining the legitimacy of SIJ petitions."  (*Romero, supra*, 205 A.3d at p. 915; see *Dany G.*, 117 A.3d at p. 655 ["It is important to remember that the juvenile court is not granting SIJ status"]; *Kitoko v. Salomao* (2019) 210 Vt. 383, 396 [215 A.3d 698] (*Kitoko*) [citing cases].)  As we have observed, the role of California courts " 'is not to determine worthy candidates for citizenship, but simply to identify abused, neglected, or abandoned [immigrant] children under [our] jurisdiction who cannot reunify with a parent or be safely returned in their best interests to their home country.' "  (*Bianka M.*, *supra*, 5 Cal.5th at p. 1025.)

This limit on the role of state courts makes sense when considered in the context of the cooperative scheme Congress established for identifying immigrant children entitled to protection as special immigrant juveniles.  (Special Immigrant Juvenile Petitions 87 Fed.Reg. 13066, 13076–13077, 13081, 13086 (Mar. 8, 2022).)  In assigning state courts the task of making SIJ predicate findings, Congress recognized their particular competence in making child welfare determinations.  (*In re Y.M.* (2012) 207 Cal.App.4th 892, 908; *Perez–Olano v. Gonzalez* (C.D.Cal. 2008) 248 F.R.D. 248, 265.)  State courts, however, lack both the authority and competence to make

immigration status determinations, which are the exclusive province of the federal government. (*Arizona v. United States* (2012) 567 U.S. 387, 394–395; *DeCanas v. Bica* (1976) 424 U.S. 351, 354.) For these reasons, Congress assigned to federal authorities, not state courts, the determination whether a child's request for SIJ status is bona fide. (*J.U.*, *supra*, 176 A.3d at p. 141, fn. 9.)[4]

Third, section 155 provides that the superior court "shall issue" the findings if "there is evidence to support" them. (§ 155, subd. (b)(1).) This language imposes a mandatory duty. (*People v. Standish* (2006) 38 Cal.4th 858, 869 [" 'shall' " is presumptively "mandatory and not permissive"].) When the facts a petitioner has established by a preponderance of the evidence support SIJ predicate findings, the superior court must issue these findings; it has no discretion to deny the petition. (See *In re Scarlett V.* (2021) 72 Cal.App.5th 495, 502 [superior court erred in concluding decision whether to issue SIJ predicate

---

[4] To this point, new federal regulations acknowledge all children seeking SIJ predicate findings are doing so in the hope of being able to apply for SIJ status. Accordingly, the desire to "obtain relief from parental abuse, neglect, abandonment, or a similar basis under State law" need only be "*a* primary reason" — not the only reason and not even *the* primary reason — the child seeks SIJ predicate findings. (8 C.F.R. § 204.11(b)(5) (2022), italics added.) In adopting this language, federal authorities recognized that SIJ predicate findings are invariably sought for purposes of applying for SIJ status, so the fact that a child is seeking the findings for immigration purposes should not be disqualifying. (Special Immigrant Juvenile Petitions, 87 Fed.Reg., *supra*, at p. 13070 [regulation's use of "a" rather than "the" before "primary reason" recognizes that "petitioners can have dual or mixed motivations for seeking the juvenile court's determinations"].)

findings was "discretionary"].) This mandate helps ensure that California courts perform their federally assigned function. While an order making SIJ predicate findings does not guarantee that federal authorities will grant an application for special immigrant juvenile status, a state court order denying SIJ predicate findings is, "in effect, a negative immigration decision." (*B.R.L.F., supra*, 200 A.3d at p. 776.) Failure to issue SIJ predicate findings when a preponderance of the evidence before the court supports them could result in a decision at odds with the ultimate judgment federal immigration authorities would have made had the superior court issued the findings, which would be contrary to purposes of both California and federal law. (*Id.* at p. 781 (conc. opn. of Ferren, J.).) As long as the child's declaration and any other evidence or testimony presented establishes the facts supporting SIJ predicate findings by a preponderance of the evidence, section 155 requires the superior court to issue the findings.

## B. Merits

Having addressed the burden of proof, we now turn to the merits. Saul argues the probate court erred in denying his petition by using unduly stringent standards to assess the nonviability of reunification and whether it would be in his best interest to be returned to El Salvador. He also contends the Court of Appeal applied the wrong standard of review. We agree and conclude that the uncontested evidence in Saul's declaration supports issuance of the findings.

### 1. Standard of Review

Saul contends the Court of Appeal misunderstood him to be arguing factual error rather than legal error, leading it to apply an overly deferential standard of review to the probate

court's decision. (See *S.H.R., supra*, 68 Cal.App.5th at p. 574 ["here . . . 'the party who had the burden of proof in the [trial] court contends the court erred in making findings against [him]' "].) Trial courts "generally are in a better position to evaluate and weigh the evidence" than appellate courts. (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 385.) Accordingly, an appellate court should accept a trial court's factual findings if they are reasonable and supported by substantial evidence in the record. (*Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 912–913; see *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.) And if a court holds an evidentiary hearing, it may make credibility determinations, to which an appellate court would generally defer. (See *Haworth*, at p. 385; but see *Leslie H., supra*, 224 Cal.App.4th at pp. 344, 352 [not deferring to superior court's adverse credibility determination where evidence in record overwhelmingly established factual basis for findings].)

However, "the application of law to undisputed facts ordinarily presents a legal question that is reviewed de novo." (*Boling*, at p. 912.) Similarly, our review is de novo when "the question is predominantly legal" and "requires a critical consideration, in a factual context, of legal principles and their underlying values." (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888; *Haworth*, at p. 385.) That is precisely the type of review called for here. In ruling on Saul's petition, the probate court did not weigh the evidence. It did not hold an evidentiary hearing or make credibility determinations based on what it heard and observed. Instead, it accepted as true the facts described in Saul's declaration. (See § 155, subd. (b)(1) [a court "shall issue" SIJ predicate findings if "there is evidence to support those findings, which may consist

solely of" the declaration of the child petitioner]; see *J.U., supra*, 176 A.3d at p. 141, fn. 9 [filings "made under penalty of perjury . . . would appear to have some presumptive validity"].)  The questions presented in this case are primarily questions of law, the resolution of which involves consideration of the language and purposes of the SIJ statutes.  (See 8 C.F.R., § 204.11(a), (c) (2022) [SIJ predicate findings are "conclusion[s] of law" by the juvenile court].)  Accordingly, our review is de novo.

## 2.  The Nonviability of Reunification Determination

Saul argues that the probate court erred in several ways in denying his request for a finding that "reunification" with his parents is "not . . . viable because of abuse, neglect, abandonment, or a similar basis pursuant to California law." (§ 155, subd. (b)(1)(B).)  He contends that in determining whether he had demonstrated neglect, the courts below improperly focused on whether his parents were blameworthy — that is, whether they had acted unreasonably under the circumstances and whether they had intentionally failed to protect and provide for him.  He also contends that the courts below erred in relying on a definition of abandonment that required a showing that his parents intended to abandon him.  And more generally, he argues that the courts below erred in choosing to apply narrow definitions of "neglect" and "abandonment" when California law supplies broader definitions of these terms and similar bases for finding that it would not be viable to reunify Saul with his parents.  Finally, Saul argues the probate court inappropriately based its ruling on its impression that the conditions Saul faces are pervasive in El Salvador rather than on whether Saul's evidence shows reunification with his parents is not viable.  We agree with Saul on each of these points and discuss each of them in turn.

We begin by noting that the purpose of the nonviability of reunification inquiry is to identify children whom it would not be viable — meaning not workable or practical — to return to live with a parent. (See *Romero, supra*, 205 A.3d at p. 915 ["viable" means "workable or practical"]; *Kitoko, supra*, 215 A.3d at p. 708 [" 'viability' " means " 'workability or practicability' "]; *Lopez v. Serbellon Portillo* (2020) 136 Nev. 472, 474 [469 P.3d 181] (*Lopez*) [same].)[5] In making this inquiry, courts should consider all relevant circumstances, including the ongoing psychological and emotional impact on the child of the past relations between the child and the parent, how forced reunification would affect the child's welfare, the parent's ability and willingness to protect and care for the child, and the

---

[5] The Court of Appeal observed that "[s]ome courts and the [United States Citizenship and Immigration Services] have interpreted the phrase as requiring the petitioner to prove that reunification with his or her parents cannot occur, or is not possible." (*S.H.R., supra*, 68 Cal.App.5th at p. 580.) However, the cases the Court of Appeal cited do not address the meaning of "not . . . viable" in section 155, subdivision (b)(1)(B). Instead, they either imprecisely paraphrase the statute, substituting "not possible" for "not . . . viable," or state the obvious conclusion that reunification is nonviable when a child cannot be reunified with a parent. (See, e.g., *O.C. v. Superior Court, supra*, 44 Cal.App.5th at pp. 82–83 [inaccurately paraphrasing statute as calling on state courts to find " ' "whether reunification with one or both of the juvenile's parents is not possible" ' "]; *D-Y-S-C-, supra*, 2019 WL 5260454 at p. *7 [concluding state court finding that child "could not be reunified with her parents due to her father's abuse and her mother's neglect and abandonment" constituted finding of nonviability of reunification].) These decisions did not interpret the SIJ statutes as requiring petitioners to prove that reunification cannot occur or is not possible.

parent's living conditions. (See *Romero,* at p. 915; *Lopez*, at p. 184.)

With this general guidance in mind, we turn to Saul's first contention: that the courts below improperly focused on whether his parents were blameworthy. The probate court construed Saul's petition as presenting "one issue": whether "the poverty of the family, which resulted in [Saul] being required to leav[e] school and begin working at an early age, qualif[ies] as 'neglect' or 'abuse' under . . . [s]ection 155." Citing cases in which the termination of parental rights was at stake, the court asserted that "the law is clear that 'poverty alone' is not a basis for judicial, neglect-based intrusion," which it considered to include the issuance of SIJ predicate findings. Saul argues the probate court erred in applying this "poverty alone" rule in the context of a petition for SIJ predicate findings, in which parental rights are not at issue. (See 8 C.F.R., § 204.11(c)(1)(ii) (2022) ["The court is not required to terminate parental rights to determine that parental reunification is not viable"].) We agree.

We have observed that the termination of parental rights "is a uniquely serious step — one widely recognized as ranking 'among the most severe forms of state action.' " (*In re A.R.* (2021) 11 Cal.5th 234, 245.) Accordingly, courts have held that a trial court may not terminate parental rights unless the state has first made efforts to assist a parent suffering from poverty. (See, e.g., *In re Serenity S.* (2020) 55 Cal.App.5th 355, 374 ["where family bonds are strained by the incidents of poverty, the [social services] department must take steps to assist the family, not simply remove the child and leave the parent on their own to resolve their condition and recover their children"].)

In the context of SIJ predicate findings, by contrast, the parent and child are already separated, parental rights are not at stake, and courts have no authority to order services to assist impoverished parents. In this context, the policy considerations animating the poverty alone rule are inapplicable. Instead, courts consider whether any state law definition of abuse, neglect, abandonment, or a similar basis applies for the purpose of determining whether it would be workable or practical to return children to live with their parents. (See *J.U., supra*, 176 A.3d at p. 141; *Kitoko, supra*, 215 A.3d at p. 708; *Lopez, supra,* 469 P.3d at p. 184.) The fact that harm to the child is attributable to a parent's poverty does not preclude a court from determining that reunification with the parent is not viable.[6] Instead, the focus of the nonviability inquiry is on the effect of that harm on the workability or practicality of returning the child to live with the parent. The probate court's reliance on the poverty alone rule was misplaced.

The Court of Appeal did not expressly endorse the probate court's reliance on the poverty alone rule to find that Saul had not established reunification was nonviable because the harm

---

[6] Indeed, a parent's poverty can *support* a finding that reunification is nonviable if poverty renders the parent unable to provide for or protect the child. (See *post*, pp. 25–27.) If the parent's poverty had rendered the parent unable to provide for or protect the child at the time the child and parent separated, a court may consider whether the parent's financial condition has improved such that poverty no longer makes it unworkable or impractical to return the child to live with the parent or whether the parent's financial condition has stayed the same or worsened. In either event, a parent's financial circumstances should be considered as part of a holistic assessment of whether returning the child to live with the parent is workable or practical.

he suffered was due to his parents' poverty, but it similarly focused on the blameworthiness of Saul's parents. Specifically, it focused on whether his parents' decisions to send him to work from a young age and to stop attending school were "reasonable" under the circumstances. (*S.H.R., supra*, 68 Cal.App.5th at pp. 578–579.) This was error for the same reason the probate court's reliance on the poverty alone rule was error: For purposes of the nonviability of reunification inquiry, the focus is on whether it is workable or practical to force the child to return to live with the parent, not on whether harm the child experienced in the past was excusable or the parent's reasons for inflicting it reasonable.

Second, Saul challenges the lower courts' reliance on a definition of "abandonment" that required a showing that the parent *intended* to abandon the child. (*S.H.R., supra*, 68 Cal.App.5th at p. 577, citing *Guardianship of Rutherford* (1961) 188 Cal.App.2d 202, 206 [" 'In order to constitute abandonment "there must be an actual desertion, accompanied with an intention to entirely sever, so far as it is possible to do so, the parental relation and throw off all obligations growing out of the same" ' "].) We agree that this reliance was misplaced. Family Code section 3402, part of California's version of the Uniform Child Custody Jurisdiction and Enforcement Act, defines "abandoned" as "left without provision for reasonable and necessary care or supervision." (Fam. Code, § 3402, subd. (a).) And Welfare and Institutions Code section 300, subdivision (g) provides a laundry list of ways in which a child may be deemed abandoned for the purposes of establishing dependency jurisdiction, among them when a child is "left without any provision for support." (See *In re E.A.* (2018) 24 Cal.App.5th 648, 663 [jurisdiction may be established based on any one of

the listed criteria].)   Neither of these definitions requires a showing that the parent intended to abandon the child.   By contrast, the California statutes that require a showing of intent to abandon involve termination of parental rights and criminal liability.   (Fam. Code, § 7822, subd. (a)(2); Pen. Code, § 271.)   While a showing of intent may be necessary in those contexts, the same showing is not required in the context of determining whether returning a child to live with a parent is workable or practical for the purpose of SIJ predicate findings.   (*J.U., supra*, 176 A.3d at p. 141; *Lopez, supra*, 469 P.3d at p. 708.)   Employing this unnecessary requirement could lead to unwarranted denials of SIJ predicate findings when, for example, a child has been orphaned, the parent is incarcerated or suffering from mental illness, or the parent's failure to adequately care for a child leads the child to leave the home or seek other sources of provision for the child's basic needs.   The probate court erred in applying overly narrow definitions of "neglect" and "abandonment" rather than asking whether any relevant definition of these terms available under California law would support a SIJ predicate finding.   (*B.R.L.F., supra*, 200 A.3d at p. 777.)

Third, and more generally, Saul contends that in focusing on whether his parents were blameworthy or acted with intent, the probate court not only employed improperly narrow definitions of "neglect" and "abandonment," but also failed to consider whether there was a "similar basis pursuant to California law" for determining that it would not be workable or practical to return Saul to live with his parents.   (§ 155, subd. (b)(1)(B).)   By adding the "similar basis found under State law" provision to the federal special immigrant juvenile statute, Congress expanded eligibility for special immigrant juvenile

status and made clear its intent for state courts to issue SIJ predicate findings to children who have suffered mistreatment that does not qualify as "abuse," "neglect," or "abandonment" under state law. (William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub.L. No. 110–457, § 235(d)(1)(A) (Dec. 23, 2008) 122 Stat. 5044; *Dany G., supra*, 117 A.3d at p. 657, fn. 6; *Romero, supra*, 205 A.3d at p. 915, fn. 24.) New federal regulations expressly allow petitioners for special immigrant juvenile status to submit evidence of a state court determination "as to how the basis is legally similar to abuse, neglect, or abandonment under State law" for purposes of determining that reunification is not viable. (8 C.F.R. § 204.11(d)(4)(i) (2022).) The probate court erred in failing to consider whether Saul had shown it would not be workable or practical to return him to live with his parents based on the provisions to which Saul had cited that do not define "abuse," "neglect" or "abandonment" but that may nevertheless provide a "similar basis" for a nonviability of reunification determination.

Among other provisions of California law, Saul cited in his petition and proposed order to Welfare and Institutions Code section 300, subdivision (b)(1). Under this provision, a child is subject to juvenile court jurisdiction and may be adjudged a dependent child if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent or guardian to adequately supervise or protect the child. . . ." (Welf. & Inst. Code, § 300, subd. (b)(1).) In *In re R.T.* (2017) 3 Cal.5th 622, 624, we explained that a parent's inability to supervise or protect a child need not amount to "neglect" or involve neglectful conduct to satisfy Welfare and Institutions

Code section 300, subdivision (b)(1). (*R.T.*, at p. 629.) That provision "authorizes dependency jurisdiction without a finding that a parent is at fault or blameworthy for her failure or inability to supervise or protect her child." (*Id.* at p. 624.) Rather than focusing on parental fault or blameworthiness, the focus instead is on "whether the child is at 'substantial risk' of 'serious physical harm or illness.' " (*Id.* at p. 634.)

For dependency purposes, California law treats a parent's inability to supervise or protect a child similarly to neglect: as a basis for invoking jurisdiction to protect a child. (See *In re Nolan W.* (2009) 45 Cal.4th 1217, 1233 ["In the dependency context, the juvenile court intervenes to protect a child, not to punish the parent"].) The purpose of dependency law is "to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (Welf. & Inst. Code, § 300.2.) This purpose mirrors the child-protective purposes of special immigrant juvenile status, rendering it a "similar basis" to "abuse, neglect or abandonment" for purposes of the nonviability of reunification determination under section 155. (See 8 C.F.R. § 204.11(d)(4)(i) (2022).) The probate court erred in failing to consider whether Saul has shown that reunification with his parents is not viable on the "similar basis" that he faces "a substantial risk [he] will suffer[] serious physical harm or illness as a result of" his parents' "failure or inability to adequately supervise or protect him." (Welf. & Inst. Code, § 300, subd. (b)(1).)

Finally, Saul argues the probate court inappropriately speculated about the pervasiveness of the conditions Saul faced

in El Salvador in determining whether reunification was nonviable. Here again, we agree. Congress specified that the nonviability of reunification determination is to be made "under State law." (8 U.S.C. § 1101(a)(27)(J)(i); see 8 C.F.R. § 204.11(c)(3)(i) (2022) [predicate findings made "under applicable State law"].) This suggests that Congress's intent was for state courts to apply state law to the facts established by the child, without considering extra-record information or making assumptions about conditions prevailing in other countries — a topic on which federal immigration authorities have far greater expertise. (See *Dany G., supra*, 117 A.3d at p. 657 [noting that state-court judges have little "expertise in understanding the living conditions for children in each of the nearly 200 nations of the world"].) As the Maryland high court has observed, "if Congress had intended to 'require knowledge of living conditions in other countries, surely federal immigration judges[, who deal with such matters regularly,] would have been a far more appropriate selection.'" (*Romero, supra*, 205 A.3d at p. 917.) Moreover, to the extent it is more common for parents in El Salvador to be unable to protect their children from gang violence than it is for parents in California, that is an improper basis for concluding that Saul has *failed* to show that reunification with his parents is nonviable due to their inability to adequately protect him from "a substantial risk" of "serious physical harm." (Welf. & Inst. Code, § 300, subd. (b)(1); see *Romero, supra*, at p. 916 [trial judges apply state law definitions in adjudicating petitions for SIJ predicate findings].)

In summary, the probate court's determination that Saul had not shown reunification with his parents was nonviable due to abuse, neglect, abandonment, or a similar basis under

California law was based on a misapprehension of the nature and purpose of this inquiry. The relevant inquiry is not whether a child's parents are blameworthy. Instead, the inquiry should focus on whether returning the child to live with the parent would be workable or practical. In making this determination, a court should consider the history of the child's relationship with the parent and whether the child would be exposed to harm if returned to live with the parent. Bearing in mind the child-protective purpose of SIJ law and that the issuance of SIJ predicate findings to a child does not in any way restrict the rights of the child's parent, courts should rely on any applicable definition of abuse, neglect, abandonment, or similar basis in California state law for finding nonviability of reunification under section 155. Finally, in determining whether mistreatment qualifies as "abuse," "neglect," "abandonment," or a "similar basis" for finding nonviability of reunification (§ 155, subd. (b)(1)(b)) courts must apply California law and may not rely on extra-record evidence or speculate about prevailing conditions in other countries.

Applying this analytical framework to the undisputed facts established by Saul's declaration, we conclude that returning Saul to live with his parents would not be workable or practical because he would face a substantial risk that he would suffer serious harm as a result of his parents' inability to protect him from gang violence while providing for his basic needs and education. (Welf. & Inst. Code, § 300, subd. (b)(1).) In El Salvador, gang members threatened Saul's life and the lives of his family members when he resisted their attempts to recruit him. His parents were unable to adequately protect him and removed him from school because they feared for his safety. After leaving school, Saul had to work to help provide for his

family's basic needs, making it difficult to avoid contact with gang members, who approached and threatened him at work as well. Based on these experiences, Saul fears that if he is forced to return to El Salvador, he will not be able to hide from the gangs and his parents will be unable to protect him from gang violence. Accordingly, reunifying Saul with his parents is not viable due to the "substantial risk" that he will suffer "serious physical harm' as a result of his parents' 'failure or inability to adequately . . . protect him" within the meaning of Welfare and Institutions Code section 300, subdivision (b)(1). (*Ibid.*)

### 3. The Best Interest Determination

Saul also contends that the probate court erred in denying his request for a SIJ predicate finding that it would not be in his "best interest" to be returned to El Salvador. (§ 155, subd. (b)(1)(C).) The best interest determination is distinct from the nonviability of reunification determination in that the court's focus is not on the relationship between the child and the child's parent. Instead, the best interest determination focuses on the effects of sending children back to live in their home countries. The court's inquiry involves a case-specific, holistic comparison of the child's circumstances in California to the circumstances in which the child would live if repatriated, including the capacities of current or potential caregivers — who may or may not be the child's parents — in each location. (U.S. Citizenship & Immigration Services, Dept. of Homeland Security, Policy Manual (2021), vol. 6, pt. J., ch. 2 (USCIS Policy Manual).)

As with the nonviability of reunification determination, federal law directs states to apply their own legal standards in making the best interest determination. (8 U.S.C. § 1101(a)(27)(J)(ii); 8 C.F.R. § 204.11(c)(2)(ii) (2022).) California

law makes "health, safety, and welfare" the court's "primary concern in determining the best interests of children" when making custody and visitation orders. (Fam. Code, § 3020, subd. (a); see *id.*, § 3011, subd. (a)(1); Prob. Code, § 1514, subd. (b).) In making such determinations, California courts give special weight to a child's wishes, assuming the child can form an intelligent preference. (See *In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432 ["the child's testimony that she wants to live with her mother constitutes powerful demonstrative evidence that it would be in her best interest to allow her to do so"]; Fam. Code, § 3042, subd. (a) [a child's preferences should be considered if the child "is of sufficient age and capacity to reason so as to form an intelligent preference"].) This emphasis on the child's wellbeing is consistent with the child-protective purposes of federal and California SIJ law and the criteria employed by other states. (See USCIS Policy Manual, *supra*, vol. 6, pt. J., ch. 2 [under state law, "safety and well-being are typically the paramount concern"].) Accordingly, in determining whether it would be in a child's best interest to be repatriated, a court should make a holistic comparison between circumstances affecting the child's health, safety, and welfare in California and in the child's home country, giving special consideration, where appropriate, to the child's wishes.

The probate court did not do this, and its reasoning was inconsistent with this standard. While the probate court acknowledged that the United States offers Saul "greater benefits," than El Salvador, it implicitly found those "benefits" — that Saul is happy and safe in California and is under the care of a guardian who provides for his daily needs and enables him to continue his education — to be outweighed by the fact that he still has family in El Salvador, lived there

most of his life, and "speaks the language," things that will be true of most newly arrived immigrant children. The probate court also improperly discounted the uncontroverted evidence in Saul's declaration of the life-threatening situation he faced in El Salvador in favor of an anecdotal observation that some Salvadoran youth avoid "hardships" such as "gang issues" and grow up to be "doctors, lawyers, and other professionals." This observation was "untethered to any evidence" in the record. (*Leslie H., supra*, 224 Cal.App.4th at p. 352 [rejecting finding that repatriation was in child's best interest that was based on "anecdotal impressions" that were "untethered to any evidence in th[e] case"].) Moreover, nothing in Saul's declaration suggested that he would be able to avoid gang violence and grow up to be a professional were he sent back to El Salvador. Saul had to work from a young age to help support his family; his parents made him leave school at age 15 after gang members threatened his life; and gang members threatened his life again at his workplace. While Saul might be able to overcome the deprivations and violence he would face in El Salvador, that does not mean it would be more conducive to his health, safety, and welfare to be involuntarily repatriated than it would be for him to remain in California under his guardian's care, as he wishes to do.

The probate court also improperly concluded that Saul's age disqualified him from establishing it would not be in his best interest to be returned to El Salvador. From the fact that Saul is "no longer a minor" — meaning no longer under the age of 18 — the court inferred he would be "no longer reliant on [his] parents for a permanent, safe, stable, and loving environment" were he returned to El Salvador. To be sure, a child's age may be relevant to the best interest determination. (See *In re*

*Marriage of Brown & Yana* (2006) 37 Cal.4th 947, 961 [listing "the child's age" as relevant factor in custody-related best interest analysis]; 8 C.F.R. § 204.11(c)(2)(ii) (2022) [clarifying that "[n]othing in this part should be construed as altering the standards for best interest determinations that juvenile court judges routinely apply under relevant State law"].) However, the probate court's unsupported inference that because Saul had turned 18, he would no longer be reliant on his parents if forced to return to El Salvador ignores federal law, under which a youth under the age of 21 is considered a "child" and, as such, is eligible for classification as a special immigrant juvenile. (8 C.F.R. § 204.11(b)(1) (2022).) The inference is also inconsistent with California law, which provides that a court may appoint a guardian for a youth "who has not yet attained 21 years of age" in connection with a petition for SIJ predicate findings. (Prob. Code, § 1510.1, subd. (a)(1).) In amending the law to add this provision, the Legislature found that it was necessary to provide an avenue by which 18- to 20-year-old youth could have a guardian appointed due to their "vulnerability" and "need for a custodial relationship with a responsible adult" as they "recover from the trauma of abuse, neglect, or abandonment." (Stats. 2015, ch. 694, § 1, subd (a)(6).) The Legislature also found that as a result of past harm, "many unaccompanied immigrant youth between 18 and 21 years of age face circumstances identical to those faced by their younger counterparts." (*Id.*, § 1, subd. (a)(5).) The probate court's assumption that because Saul had reached the age of 18, he was no longer reliant on a parent or guardian for support and protection is contrary to these legislative findings and the

32

Legislature's and Congress's intent.[7]    Regardless of the petitioner's age, the relative capacity of potential caregivers in the child's home country and in California is relevant to the determination whether being returned would be conducive to the child's health, safety, and welfare.  The probate court erred in assuming otherwise based on Saul's age alone and in declining to make a finding that it would not be in his best interest to be repatriated to El Salvador based on this assumption.

Comparing the uncontroverted evidence of Saul's circumstances in California to the uncontroverted evidence of the circumstances to which he would return in El Salvador, we conclude Saul has established it would not be in his best interest to be returned to El Salvador.  In California, Saul has a guardian who provides him with food and shelter and ensures he gets health care and can continue his education.  Saul wants to remain in his guardian's care so he can focus on his education without fear of gang violence.  (Fam. Code, § 3042, subd. (a).)  In

---

[7]    The Court of Appeal did not reach the best interest question, so it did not rule on whether the probate court erred in relying on Saul's age to reject his request for a finding that it would not be in his best interest to be returned to El Salvador. However, it similarly relied on improper speculation in upholding the probate court's denial of a nonviability of reunification predicate finding when it reasoned that "as an adult" Saul may not need "the level of support for a child" and musing that "[a]rguably . . . reunification has meaning only in the context of parents and their minor children . . . ." (*S.H.R., supra*, 68 Cal.App.5th at pp. 582, 581, fn. 13.)  It would be contrary to legislative intent to deny an application for SIJ predicate findings based on an assumption that a petitioner under the age of 21 is no longer in need of parental support or protection.

El Salvador, Saul's parents are unable to provide for him. If he is repatriated, it is unlikely he will be able to pursue his education. He will have to work to provide for his basic needs and will be unable to avoid contact with gangs that have threatened his life. His parents cannot protect him from the gangs and the police are unable or unwilling to do so. For these reasons, returning Saul to live in El Salvador would be detrimental to his health, safety, and welfare, and accordingly contrary to his "best interest[]" as that term is defined under California law. (Fam. Code, § 3020, subd. (a); see *id.,* § 3011, subd. (a)(1).)

## III. DISPOSITION

We reverse the Court of Appeal's judgment and direct that this case be remanded to the probate court with directions to reinstate Rivas's guardianship[8] and expeditiously issue an order granting Saul's petition for SIJ predicate findings in accordance with the guidance set out in this opinion, allowing enough time to ensure Saul can file an application with United States Citizenship and Immigration Services for special immigrant juvenile status before his twenty-first birthday.[9] To help ensure

---

[8] Amicus curiae Public Counsel argues that the probate court erred in revoking its guardianship order on the ground that it was rendered "moot" by the court's denial of Saul's petition for SIJ predicate findings. (See *S.H.R.*, *supra*, 68 Cal.App.5th at p. 583 [affirming].) Saul did not raise this issue in his petition for review and we do not reach it. Our remand necessitates reinstatement of the guardianship order.

[9] Ordinarily, having concluded the lower courts erred in their legal analysis, we would remand for further consideration in light of our opinion. In this case, however, Saul's declaration, which the probate court credited in its entirety, establishes facts

sufficient time on remand, our decision will become final and remittitur issue seven days from the date we file this opinion. (Cal. Rules of Court, rules 8.532(b)(1)(A), 8.540(b)(1).)

**GROBAN, J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**JENKINS, J.**
**GUERRERO, J.**

---

sufficient to support the findings. To avoid further delay, we have chosen to apply the law to Saul's undisputed evidence and have determined SIJ predicate findings are warranted. In cases in which there are material conflicts in the evidence or credibility issues, factfinding should be left to the trial courts, which are best equipped to make these determinations.

Guardianship of SAUL H.

S271265


Concurring Opinion by Chief Justice Cantil-Sakauye


I concur in the judgment. As the majority opinion concludes, the probate court should have made special immigrant juvenile (SIJ) findings in light of the threats Saul H. received from gang members in El Salvador, and I agree with the majority insofar as it orders the issuance of these findings.

I write separately, however, because we need not reach all of the legal issues pertaining to SIJ proceedings that the majority opinion directly or obliquely addresses. In his petition requesting SIJ findings, Saul indicated that reunification with his parents was not viable because he was a person described by Welfare and Institutions Code section 300, subdivision (b), which applies in situations where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness . . . as a result of the failure or inability of the child's parent or guardian to adequately supervise or protect the child . . . ." (*Id.*, subd. (b)(1).) To substantiate this assertion, as well as his claim that a return to El Salvador would not be in his best interests, Saul submitted a declaration that described his receipt of serious threats from gang members that stifled his education and employment, as well as the powerlessness of his parents and police to protect him from this intimidation. And by all indications, the probate court accepted the avowals in Saul's declaration as true. On this record, we do not have to say a great deal about SIJ proceedings in order to reverse the judgment on the basis that the probate court failed

to properly incorporate the unchallenged gang-related evidence into its analysis, then compounded this error by indulging in speculation regarding conditions in El Salvador — the critical reasoning ultimately adopted by the majority.

The majority opinion nevertheless includes a comprehensive discussion of the law deemed applicable to the evaluation of SIJ petitions by courts of first instance and to appellate review of decisions to withhold SIJ findings. This discussion includes some observations that are clearly relevant to the court's ultimate holding, and some others that are more in the nature of guidance that may be pertinent in future cases, if not this one. I would instead focus more narrowly upon the subset of issues relating to SIJ proceedings that, properly resolved, yield today's result.

In any event, when this court provides guidance that may go beyond the facts of a particular dispute, such efforts are subject to the foundational rule that "[a]s we have said many times, ' " 'the language of an opinion must be construed with reference to the facts presented by the case, and the positive authority of a decision is coextensive only with such facts.' " ' " (*Trope v. Katz* (1995) 11 Cal.4th 274, 284; see also *Santisas v. Goodin* (1998) 17 Cal.4th 599, 620 ["An appellate decision is not authority for everything said in the court's opinion but only 'for the points actually involved and actually decided' "].) To state the obvious, we have no occasion here to consider circumstances materially different from those presently before us. The adjudication of future SIJ petitions may illuminate considerations and distinctions that are not presently within our contemplation. When those situations

arise, I trust that courts will understand what the facts of this case did and did not require us to decide.

**CANTIL-SAKAUYE, C. J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Guardianship of Saul H.

---

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 68 Cal.App.5th 563
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S271265
**Date Filed:** August 15, 2022

---

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Scott J. Nord

---

**Counsel:**

Horvitz & Levy, Jason R. Litt, David S. Ettinger, Anna J. Goodman, Beth J. Jay, Christopher D. Hu; Immigrant Defenders Law Center, Bhairavi Asher, Abigail Ward Lloyd, Marion Donovan-Kaloust; Disability Rights California and Munmeeth Soni for Petitioner and Appellant.

Manatt, Phelps & Phillips, Gregory N. Pimstone, Joanna S. McCallum, Sirena P. Castillo, Jessamyn Vedro, Thomas R. Worger and Kyla Wyatt for National Immigrant Women's Advocacy Project as Amicus Curiae on behalf of Petitioner and Appellant.

Akin Gump Strauss Hauer & Feld, Joshua D. Tate; California Appellate Law Group, Rex S. Heinke and Jessica M. Weisel for Public Counsel as Amicus Curiae on behalf of Petitioner and Appellant.

Maria Blanco, Vivek Mittal, Alfonso Maldonado-Silva and Sarah Domenick for University of California Immigrant Legal Services Center as Amicus Curiae on behalf of Petitioner and Appellant.

Dennis A. Fischer, Robin B. Johansen, R. Rothschild, Scott M. Reddie; Arnold & Porter Kaye Scholer, Sean M. SeLegue; Law Offices of Robert S. Gerstein, Robert S. Gerstein; Colantuono, Highsmith & Whatley and Michael G. Colantuono for California Academy of Appellate Lawyers as Amicus Curiae on behalf of Petitioner and Appellant.

Munger, Tolles & Olson, Joseph D. Lee, J. Max Rosen and Stephen Hylas for Bet Tzedek as Amicus Curiae on behalf of Petitioner and Appellant.

Latham & Watkins, Christopher S. Yates, Elizabeth L. Deeley, Austin L. Anderson, Kailen M. Malloy; and Elizabeth A. Greenman for Kids in Need of Defense as Amicus Curiae on behalf of Petitioner and Appellant.

No appearance for Real Parties in Interest.

Greines, Martin, Stein & Richland, Jeffrey E. Raskin and Stefan C. Love, as Amici Curiae, upon request of the Supreme Court.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

David S. Ettinger
Horvitz & Levy LLP
3601 West Olive Avenue, 8th Floor
Burbank, CA 91505
(818) 995-0800

Stefan C. Love
Greines, Martin, Stein & Richland LLP
5900 Wilshire Boulevard, 12th Floor
Los Angeles, CA 90036
(310) 859-7811